OPINION
{¶ 1} Defendant-appellant, Thomas James Barton, appeals his conviction and sentence in the Warren County Court of Common Pleas for complicity to involuntary manslaughter and complicity to aggravated burglary.
 {¶ 2} Appellant was a lieutenant with the Springboro Police Department. In April 1995, appellant and his wife of 15 years, Vickie Barton, were living on their horse farm in Franklin Township, in Warren County, Ohio. The couple's farm was located about five miles *Page 2 
outside of the city limits of Springboro.
 {¶ 3} On April 11, 1995, a police dispatcher with the Warren County Communication Center received a 911 call from appellant. Appellant told the dispatcher, "there's a murd — my wife has just been killed, I think." Appellant identified himself, gave his address, and told the dispatcher that he had just returned home and found his wife lying on their bed, with a pillow over her face. He asked for an emergency squad. The dispatcher told appellant to check to see if his wife was still breathing. After doing so, appellant reported to the dispatcher that his wife was "not breathing" and was "cold," and that she had been "gone for awhile."
 {¶ 4} The police detectives who responded to the scene found that Vickie had three gunshot wounds to her head. There was also evidence that she sustained pre-mortem injuries and had been sexually assaulted. A bite mark was found on her left breast, from which DNA evidence was obtained.
 {¶ 5} Appellant was initially cleared as a suspect in the case after it was learned that he had been elsewhere at the probable time of Vickie's death. The case remained unsolved for a number of years.
 {¶ 6} In November 1998, a career criminal named Gary Henson was arrested by Middletown Police Detective Frank Hensley on suspicion that he had been involved in an unrelated burglary. According to Detective Hensley's account of his interview with Henson, Henson told the detective the following facts about the killing of Vickie Barton:
 {¶ 7} Henson said that his half-brother, William Phelps, had become romantically involved with Vickie. Phelps told Henson that he came to Vickie's house on the day she was killed, and when he thought she had left, he and another man who was with him began to steal things from her residence. However, when Phelps saw that Vickie had not left, he panicked and shot her. Phelps committed suicide four months after the incident. Henson *Page 3 
told Detective Hensley that he believed Phelps had committed suicide as a result of his having killed Vickie.
 {¶ 8} Detective Hensley relayed this information to Detective J.R. Abshear of the Warren County Sheriff's Office, who was in charge of the investigation of Vickie's killing. As a result of this information, Phelps' body was exhumed in order to obtain a sample of his DNA. However, subsequent testing revealed that Phelps' DNA did not match the DNA collected from Vickie on the day she was killed. Consequently, the case remained unsolved.
 {¶ 9} In April 2003, a "cold case" squad, headed by Captain John Newsom, was assembled by the Warren County Sheriff's Office to solve the Vickie Barton case. Captain Newsome and his team examined all of the evidence that had been collected in the case, including a tape recording of appellant's 911 call on the day of Vickie's killing, and a transcript of that call.
 {¶ 10} When Captain Newsome listened to the 911 tape, he heard appellant say, "I gotta call Phelp man." Captain Newsome noticed that the transcript of the 911 call had the word "Phelp" incorrectly transcribed as "Phillip." When Captain Newsom and his fellow officers discovered the name "Phelp" on the 911 tape, they remembered that the file in the Vickie Barton case included an exhumation of a "William Phelps," which had occurred in 1998. When the officers looked into Phelps' file, they found the name of Gary Henson.
 {¶ 11} Detectives from the cold case team interviewed Henson in August 2003, and asked him to reveal what he knew about the 1995 burglary of appellant's and Vickie's residence, in which Vickie was killed. At that time, Henson provided information to the detectives that implicated appellant in Vickie's killing.
 {¶ 12} On April 9, 2004, appellant was indicted by a Warren County Grand Jury on two counts of involuntary manslaughter, two counts of aggravated burglary, and one count of burglary. The state (hereinafter "appellee") alleged that appellant acted with complicity to *Page 4 
commit each of the principal offenses listed in the indictment.[1]
 {¶ 13} Appellee's theory of the case was that appellant had hired Phelps to stage a burglary at the Bartons' residence. The purpose of the staged burglary was to scare Vickie into moving away from the couple's horse farm, which Vickie was known to have been passionate about, and into the city limits of Springboro where, presumably, Vickie would feel safer, following the "burglary." The reason appellant wanted to move into the city limits of Springboro was that appellant wanted to become that city's police chief. Springboro has an unwritten rule that requires its police chief to reside in the city. Thus, appellee theorized that appellant wanted Vickie and himself to move into Springboro in order to improve his chances of becoming that city's police chief.
 {¶ 14} At appellant's trial, appellee presented a copy of the 911 tape, and the testimony of several of the police officers dispatched to the scene on the day Vickie was killed. The officers testified that the burglary of appellant's and Vickie's residence appeared to have been staged.
 {¶ 15} Appellee's key witness was Henson, who testified that appellant had paid Phelps $3,000 to go to his and Vickie's residence to scare Vickie. Henson testified that appellant did not tell Phelps why he wanted Vickie scared, but gave him two guns with which to scare her.
 {¶ 16} Henson said that, initially, Phelps had enlisted his aid in carrying out his plan to scare Vickie, which they planned to do by "lay[ing] the house out," i.e., entering the residence and laying out some of the personal possessions they found inside, to make it appear as if an intruder had been preparing to steal them. However, Henson could not help Phelps carry out his plan to scare Vickie because he was in jail at the time the staged burglary was supposed *Page 5 
to be carried out. As a result, Phelps obtained the assistance of an unidentified accomplice.
 {¶ 17} Henson testified that Phelps told him that when he and his accomplice went to Vickie's residence to try to scare her, she surprised them. Phelps said that his accomplice "panicked" and then shot and killed Vickie. Phelps also said that at one point during the encounter, his accomplice, whom Phelps referred to as a "sick fuck," bit Vickie on the "tit" and sexually assaulted her.
 {¶ 18} On cross-examination, Henson denied telling Detectives Hensley and Abshear that Phelps had told him that he [meaning, Phelps] shot and killed Vickie. Rather, Henson insisted that when he had made such a statement to Detective Hensley, the "he" that he was referring to was Phelps's unidentified accomplice, not Phelps himself.
 {¶ 19} In the presentation of their case, the defense called Detective Hensley who related the November 1998 conversation he had with Henson. Detective Hensley stated that Henson was referring to Phelps, and not his unidentified accomplice, when Henson told the detective that Phelps said that he (Phelps) shot and killed Vickie. Appellant also presented two experts who testified that on the disputed portion of the 911 tape, appellant said, "I gotta call for help, man." Appellee rebutted this testimony with its own expert who asserted that appellant said, "I gotta call Phelp, man."
 {¶ 20} On February 18, 2005, the jury convicted appellant of one count of complicity to involuntary manslaughter and two counts of complicity to aggravated burglary. On February 22, 2005, appellant moved for a new trial based on newly discovered evidence. Following an evidentiary hearing, the trial court overruled appellant's motion for a new trial.
 {¶ 21} At appellant's sentencing hearing, the trial court merged appellant's convictions on the two counts of complicity to aggravated burglary, finding that the charges were allied offenses of similar import. The court then sentenced appellant to 5 to 25 years imprisonment for the charge of complicity to aggravated manslaughter, and 10 to 25 years imprisonment for *Page 6 
the charge of complicity to aggravated burglary. The trial court ordered appellant to serve those terms consecutively.
 {¶ 22} Appellant now appeals from his conviction and sentence, raising eleven assignments of error. We shall address the assignments of error in an order that facilitates our analysis of the issues raised therein.
 I {¶ 23} Assignment of Error No. 1:
 {¶ 24} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO GRANT HIM A NEW TRIAL."
 {¶ 25} Appellant argues that the trial court erred in refusing to grant him a new trial since he produced new evidence which, if believed by the jury, would have required an acquittal. We disagree with this argument.
 {¶ 26} Crim.R. 33 states in pertinent part:
 {¶ 27} "(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
 {¶ 28} "* * *
 {¶ 29} "(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial."
 {¶ 30} A motion for a new trial is not to be granted lightly.Toledo v. Stuart (1983), 11 Ohio App.3d 292, 293. The decision whether to grant a new trial on grounds of newly-discovered evidence rests within the trial court's sound discretion. State v. LaMar,95 Ohio St.3d 181, 202, 2002-Ohio-2128, citing State v. Hawkins (1993),66 Ohio St.3d 339, 350. "An abuse of discretion `connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" State v. Jackson, *Page 7 107 Ohio St.3d 53, 89, 2005-Ohio-5981, ¶ 181, quoting State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 31} To warrant the granting of a new trial, the new evidence must, at the very least, disclose a "strong probability" that it will change the result if a new trial is granted, and must not be merely cumulative to former evidence. Lemar, 95 Ohio St.3d at 202, citing State v.Petro (1947), 148 Ohio St. 505, syllabus.
 {¶ 32} Following his conviction, appellant moved for a new trial based on newly discovered evidence from several of Henson's cellmates, including Danny Ray Clark and James Hoge. Clark and Hoge submitted affidavits on behalf of appellant, in which they asserted that Henson had told them that appellant had nothing to do with the incident in which his wife was killed. Hoge added that Henson had told him that he (Henson) knew appellant was innocent.
 {¶ 33} Appellee responded with an affidavit from Henson, himself, in which Henson asserted that he had testified truthfully at trial and was not recanting his testimony. He stated that he tried to talk about the case as little as possible with other inmates because he feared being branded a "snitch." He also stated that whenever he did speak about the case with other inmates, he would attempt to minimize the value of his testimony to the prosecution, and that he lied to other inmates about what he knew in order to avoid being labeled a snitch. Additionally, the state presented the affidavit of Detective Robert Schmidt, who stated that he had advised Henson that he should lie to the other inmates to deflect any unwanted attention.
 {¶ 34} The trial court held an evidentiary hearing on appellant's motion for a new trial, at which both Clark and Hoge testified.[2]
Following the hearing, the trial court overruled *Page 8 
appellant's motion. The trial court's decision to do so was not an abuse of discretion in light of all of the facts and circumstances of this case.
 {¶ 35} As the trial court noted, Clark and Hoge, like Henson, are not model citizens. Both Clark and Hoge are convicted felons. Additionally, at the time of his testimony regarding what Henson had told him, Hoge was being evaluated for his competency to stand trial. Although Henson is a career criminal who has credibility problems like Clark and Hoge, Henson's trial testimony was corroborated by other evidence that strongly pointed to appellant's guilt, including the 911 tape, in which appellant can be heard saying "I gotta call Phelp, man," and the testimony of several police officers who testified that the burglary that took place at appellant's and Vickie's residence on the day Vickie was killed appeared to have been staged.
 {¶ 36} In light of all of the evidence presented in this case, we conclude that appellant has failed to show that there is a "strong probability" that the result of his trial would have been different if a new trial had been granted. Lemar, 95 Ohio St.3d at 202. Consequently, we conclude that the trial court did not abuse its discretion in overruling appellant's motion for a new trial.
 {¶ 37} Appellant's first assignment of error is overruled.
II
 {¶ 38} Assignment of Error No. 2:
 {¶ 39} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO EXCLUDE HEARSAY EVIDENCE."
 {¶ 40} Appellant argues that the trial court erred by refusing to exclude Henson's *Page 9 
testimony concerning what Phelps had told him about his and appellant's involvement in the staged burglary that took place on April 11, 1995, in which Vickie Barton was killed. He asserts that Henson's testimony about what Phelps told him should have been excluded as hearsay because (1) Phelps' statements did not fall within the hearsay exception for statements made against penal interest since the statements were untrustworthy, and (2) permitting Henson to testify about what Phelps told him violated his right of confrontation under both the United States and Ohio Constitutions. We disagree with both of these arguments.
 {¶ 41} As a threshold matter, we note that while appellant filed a pretrial motion in limine seeking to exclude Henson's testimony about what Phelps had told him, which the trial court overruled, it is axiomatic that an order granting or denying a motion in limine, in and of itself, does not preserve the record on appeal. See State v.Grubb (1986), 28 Ohio St.3d 199, 201-203.
 {¶ 42} Here, appellant failed to raise an objection at trial to Henson's testimony regarding what Phelps had told him and, therefore, appellant has waived all but plain error with respect to this issue. See id. As a general rule, plain error is to be recognized only where "the outcome of the trial clearly would have been different absent the error." State v. Hill, 92 Ohio St.3d 191, 203, 2001-Ohio-141. Additionally, "plain error should be found only in exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. In this case, the trial court's decision to allow Henson to testify about what Phelps told him did not amount to any error, plain or otherwise.
 {¶ 43} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions to the hearsay rule. See Evid.R. 802. One such exception is for *Page 10 
statements "against penal interest" contained in Evid.R. 804(B)(3). Evid.R. 804 states in pertinent part:
 {¶ 44} "(B) Hearsay exeptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 {¶ 45} "* * *
 {¶ 46} "(3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 47} "The determination of whether corroborating circumstances are sufficient to admit statements against penal interest, as a hearsay exception, generally rests within the discretion of the trial court."State v. Landrum (1990), 53 Ohio St.3d 107, 114.
 {¶ 48} "The existence or nonexistence of corroborating circumstances also invokes Confrontation Clause concerns." State v. Yarbrough,95 Ohio St.3d 227, 233-236, 2002-Ohio-2126. The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Similarly, Article I, Section 10 of the Ohio Constitution guarantees the accused the right to "meet the witnesses face-to-face."
 {¶ 49} In Ohio v. Roberts (1980), 448 U.S. 56, 100 S.Ct. 2531, the United States Supreme Court identified two values underlying the Confrontation Clause: (1 ) the Framers' preference for face-to-face accusation, and (2) the reliability of the hearsay statement. Id. at 65-66. In furtherance of these values, the court held that the party offering the hearsay *Page 11 
evidence had to show that the declarant is "unavailable" and that the statement bears adequate "indicia of reliability." Id. at 66. The reliability requirement may be met by showing that the statement falls within a "firmly rooted hearsay exception," which renders it presumptively reliable, or that it possesses "particularized guarantees of trustworthiness." Id. at 66.
 {¶ 50} In Crawford v. Washington, (2004), 541 U.S. 36, 124 S.Ct. 1354, the court rejected the reliability requirement of Roberts with respect to "testimonial" statements,[3] and held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 68. Consequently, theCrawford court held that where testimonial evidence is at issue, the Confrontation Clause requires unavailability and a prior opportunity for cross-examination in order for the evidence to be deemed admissible. Id.
 {¶ 51} Conversely, Crawford held that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as doesRoberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Id.
 {¶ 52} Reviewing courts employ a de novo standard when reviewing a claim that a criminal defendant's rights have been violated under the Confrontation Clause. State v. Jackson, Cuyahoga App. No. 86105,2006-Ohio-174, citing United States v. Robinson *Page 12 
(C.A.6, 2004), 389 F.3d 582, 592.
 {¶ 53} Applying the foregoing to the facts of this case, we first note that since Phelps was deceased at the time of Henson's testimony, Phelps was "unavailable" for purposes of both Evid.R. 804(B)(3) and the Confrontation Clause of the Sixth Amendment of the United States Constitution. See Evid.R. 804(A)(4) and Roberts, 448 U.S. at 74.
 {¶ 54} Second, as appellant himself acknowledges, Phelps' statements do not fall into any of the categories of "testimonial" statements identified in Crawford, see fn. 3, and Crawford, 541 U.S. at 51-52, 68, and, thus, Phelps' statements to Henson are "nontestimonial." As we have indicated, under Crawford, the states have flexibility in their development of hearsay law regarding nontestimonial statements, and may follow the approach outlined in Roberts, or may exempt such statements from Confrontation Clause scrutiny altogether. See Crawford,541 U.S. at 68. One appellate district in this state, citing this language fromCrawford, has concluded that the reliability test of Roberts still applies with respect to nontestimonial hearsay. State v. Crager,164 Ohio App.3d 816, 823, 2005-Ohio-6868, ¶ 26.
 {¶ 55} Assuming that Roberts still applies to nontestimonial statements, we then must determine whether Henson's testimony about what Phelps told him bears adequate "indicia of reliability," i.e., either the statement falls within "a firmly rooted hearsay exception" or has "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66.
 {¶ 56} Initially, Phelps' statements to Henson do not fall within a firmly rooted exception to the hearsay rule. As the Ohio Supreme Court has said, "[t]he hearsay exception for statements against interest is not a firmly rooted exception, at least when the statement is `offered by the prosecution to establish the guilt of an alleged accomplice of the declarant.'" State v. Yarbrough, 95 Ohio St.3d 227, 234,2002-Ohio-2126, quoting State v. Madrigal, 87 Ohio St.3d 378,2000-Ohio-448. *Page 13 
 {¶ 57} Nevertheless, Phelps' statements to Henson possess "particularized guarantees of trustworthiness," which makes them reliable under Roberts, and there are "corroborating circumstances [that] clearly indicate the trustworthiness of the statements]," which makes them admissible under the hearsay exception for statements against penal interest contained in Evid.R. 804(B)(3).
 {¶ 58} The Ohio Supreme Court has ruled that statements against a declarant's penal interest, which are made privately to relatives or close friends, contain the necessary guarantees of trustworthiness to enable a trial court to admit them. See, e.g., Yarbrough,95 Ohio St.3d at 235-236 ("where a declarant makes a statement to someone with whom he has a close personal relationship, such as a spouse, child, or friend, courts usually hold that the relationship is a corroborating circumstance supporting the statement's trustworthiness") (emphasis sic); and State v. Issa, 93 Ohio St.3d 49, 60-61, 2201-Ohio-1290 (accomplice's statements to his friends were sufficiently reliable since accomplice implicated himself in a serious crime and did not shift the blame by implicating defendant).
 {¶ 59} In this case, Phelps' statements were made to his half-brother, Henson, with whom he shared a close relationship. Phelps did not make the statements while talking to the police as a suspect, unlike the out-of-court declarants in Lilly v. Virginia (1999), 527 U.S. 116, 119, S.Ct. 1887, and Madrigal, 87 Ohio St.3d 378. Furthermore, Phelps had nothing to gain from inculpating appellant in the crime. SeeIssa, 93 Ohio St.3d at 61. By stating that appellant had hired him to stage a burglary of appellant's and Vickie's residence, during which Vickie was raped and killed, Phelps was admitting his role in an aggravated burglary that resulted in Vickie's death. Id.
 {¶ 60} While Phelps placed the blame for Vickie's killing on his unidentified accomplice, and spread some of the blame for the offenses to appellant, he did not shift the blame for Vickie's killing on appellant. In fact, Phelps' statement actually served to exonerate *Page 14 
appellant from a charge that appellant intended for Vickie to be killed in the staged burglary. As a result, Phelps' statements made Phelps and his unidentified accomplice significantly more responsible than appellant for Vickie's killing. Thus, the corroborating circumstances in which Phelps' statements were made clearly indicate the statements' trustworthiness under Evid.R. 804(B)(3), and Phelps' statements possess "particularized guarantees of trustworthiness," which renders the statements reliable under the Confrontation Clause.Roberts, 448 U.S. at 66.
 {¶ 61} Consequently, we conclude that the admission of Phelps' statements through Henson's testimony did not violate either the Confrontation Clause of the United States Constitution or Evid.R. 804(B)(3). See Yarbrough, 95 Ohio St.3d at 236; and State v. Hand,107 Ohio St.3d 378, 393, 2006-Ohio-18 (where a person makes a statement to a close family member that implicates the person in a crime, this corroborating circumstance is sufficient to support statement's trustworthiness, rendering the statements admissible under Evid.R. 804[B][3]). Cf., Lilly v. Virginia (1999), 527 U.S. 116, 137-139,119 S.Ct. 1887 (statements against penal interest are not reliable when made to police officers in a custodial setting).
 {¶ 62} Appellant also argues that Phelps' statements to Henson should have been ruled inadmissible under the rule announced in Bruton v.United States (1968), 391 U.S. 123, 88 S.Ct. 1620. We disagree with this argument.
 {¶ 63} Under the Bruton rule, in cases where a defendant and a co-defendant are tried together, and the co-defendant does not take the stand, the admission of the co-defendant's confession inculpating the defendant denies the defendant his rights of confrontation and cross-examination under the Sixth Amendment of the United States Constitution. See id. at 126-127.
 {¶ 64} In State v. Young (1983), 5 Ohio St.3d 221, the Ohio Supreme Court stated that Bruton had held that "where there are co-defendants, one who has confessed and one *Page 15 
who has not, the co-defendants are entitled to separate trials and the one defendant's confession is not admissible against the other."Young at 225. The Young court held that "a statement by a co-defendant who is granted a separate trial may not be read into evidence at the trial of the other co-defendant where it defeats the right of confrontation." Id.
 {¶ 65} Appellant argues that these principles must be applied to this case and, as a result, Phelps' statements must be ruled as inadmissible against him. We disagree with this argument.
 {¶ 66} At the time of trial, Phelps had been dead for more than nine years. Phelps and appellant have never been co-defendants in this matter; consequently, Bruton and Young have no application to this case. Instead, appellant's rights under the Confrontation Clause of the United States Constitution must be judged under the principles set forth inCrawford.
 {¶ 67} As we have indicated, Crawford provides that where the hearsay evidence at issue is "testimonial," the Confrontation Clause requires unavailability of the declarant and a prior opportunity for cross-examination in order for the evidence to be deemed admissible.Crawford, 541 U.S. at 68. In this case, appellant has conceded that Phelps' statements are "decidedly" nontestimonial underCrawford.
 {¶ 68} Crawford further provides that where nontestimonial hearsay is at issue, states may either adopt the approach outlined inRoberts or exempt such statements from Confrontation Clause scrutiny, altogether. Crawford at 68. Assuming that Roberts still applies to nontestimonial statements, see Crager, 164 Ohio App.3d at 823, we conclude that Phelps' statements are admissible under either the Confrontation Clause of the United States Constitution or Evid.R. 804(B(3), for the reasons stated above.
 {¶ 69} In light of the foregoing, we conclude that the trial court did not violate appellant's rights under the Confrontation Clause of the United States Constitution by *Page 16 
admitting Henson's testimony regarding what Phelps had told him about Phelps' and appellant's involvement in the staged burglary that resulted in Vickie's killing. We also conclude that the trial court did not abuse its discretion by allowing Henson's testimony about what Phelps had told him, pursuant to the hearsay exception for statements against penal interest under Evid.R. 804(B)(3).
 {¶ 70} Appellant's second assignment of error is overruled.
 III {¶ 71} Assignment of Error No. 4:
 {¶ 72} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO EXCLUDE A COPY OF THE 911 TAPE."
 {¶ 73} Appellant argues that the trial court erred by refusing to exclude from evidence a copy of the 911 tape from April 11, 1995, because there are questions regarding the tape's authenticity, and it was unfair to the defense under the circumstances to admit a copy of the tape in lieu of the original. We disagree with this argument.
 {¶ 74} Evid.R. 1002, which is more commonly known as the "best evidence" rule, states:
 {¶ 75} "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio."
 {¶ 76} Evid.R. 1003 states:
 {¶ 77} "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." *Page 17 
 {¶ 78} "An `original' of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it." Evid.R. 1001(3). "A `duplicate' is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original." Evid.R. 1001(4).
 {¶ 79} "The party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded." State v.Tibbetts, 92 Ohio St.3d 146, 160, 2001-Ohio-132. The party seeking to exclude a duplicate cannot rely on mere speculation as to its authenticity. See Evid.R. 1003 and State v. Easter (1991),75 Ohio App.3d 22, 27. Furthermore, "the decision to admit duplicates, in lieu of originals, is one that is left to the sound discretion of the trial court." Id.
 {¶ 80} When the party opposing the duplicate's admission raises a genuine question as to the duplicate's trustworthiness, the trial court must determine whether the testimony authenticating the duplicate is sufficient to convince the court "of the improbability of the original item having been exchanged with another or otherwise tampered with." Id. at 267. The trial court's ruling on the sufficiency of authentication evidence is also reviewed under an abuse of discretion standard. Id.
 {¶ 81} In this case, the trial court found that the original reel-to-reel copy of the 911 tape was "recycled" and destroyed in accordance with the standard business practices and procedures of Warren County's Emergency Dispatching Center. Before it was destroyed, the recording on the reel-to-reel tape was transferred to a cassette tape pursuant to the county's standard practices and procedures. The trial court admitted the cassette tape of the 911 call after the dispatcher for the Communication Center testified that the cassette tape was a true and accurate representation of his conversation with appellant on the day of Vickie Barton's *Page 18 
killing.
 {¶ 82} In order to demonstrate that a genuine question exists as to the authenticity of the tape and that it was unfair to admit the tape into evidence, appellant relies primarily on the fact that a transcript of the original reel-to-reel tape shows that the portion of the tape in which appellee alleges that appellant is saying, "I gotta call Phelp, man" was originally transcribed as, "I gotta call Phillip, man." Appellant argues that this fact renders the tape "untrustworthy," raises a genuine question regarding the tape's authenticity, and makes it "unfair" to admit the tape in lieu of the original. We disagree with these assertions.
 {¶ 83} The fact that the original reel-to-reel recording of the 911 call was interpreted by the person who transcribed the recording as saying "Phillip" rather than "Phelp" is insufficient to demonstrate that the cassette tape that was admitted into evidence should have been excluded. Errors in transcribing words from an audiotape are not uncommon. This is particularly true when a person's name is being transcribed. This fact does not create a "genuine question" regarding the authenticity of the cassette tape at issue in this case, nor does it render the tape's admission "unfair," for purposes of Evid.R. 1003. The trial court acted within its discretion to allow the jury to decide what was said on the cassette tape.
 {¶ 84} Appellant also argues that the destruction of the original reel-to-reel recording of the 911 call deprived him of due process of law where the wording on the tape was crucial to his defense and could not be obtained by other duplicate means. We disagree with this argument.
 {¶ 85} The state presented evidence showing that before the original reel-to-reel recording was destroyed, a copy of the recording was made on a cassette tape pursuant to the standard business practices and procedures of the Warren County Emergency Dispatching Center. Furthermore, the state authenticated the tape by presenting the testimony of the dispatcher who answered appellant's 911 call on April 11, 1995. The *Page 19 
dispatcher testified that the tape was a true and accurate representation of the conversation he had had with appellant on the day Vickie was killed.
 {¶ 86} By contrast, appellant has presented no evidence to demonstrate that the cassette tape that was admitted into evidence was not a duplicate of the original reel-to-reel recording of the 911 call. Instead, his claims are mere speculation. Appellant has failed to demonstrate that he was deprived of due process of law as a result of the trial court's decision to admit the cassette tapes of the 911 call.
 {¶ 87} Appellant's fourth assignment of error is overruled.
 IV {¶ 88} Assignment of Error No 5:
 {¶ 89} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT PERMITTED EVIDENCE REGARDING DEFENDANT-APPELLANT'S ALLEGED DECEPTION WHEN TAKING A POLYGRAPH TEST."
 {¶ 90} Appellant argues that the trial court erred in permitting appellee to present the testimony of a polygraph examiner who testified that appellant had engaged in "deceptive breathing techniques" while taking a polygraph test administered by the examiner. He argues that the trial court's decision to admit the polygraph examiner's testimony was erroneous because the results of a polygraph test are inadmissible since the test is considered inherently unreliable and, therefore, it was improper to admit evidence that he had attempted to interfere with the test. We disagree with this argument.
 {¶ 91} A few days before the start of the trial, appellee filed a motion in limine requesting that it be allowed to introduce evidence that appellant had taken a polygraph test, during which he attempted to deceive the polygraph examiner through the use of deceptive breathing techniques. The trial court denied appellee's motion in limine. *Page 20 
 {¶ 92} During the trial, appellant's defense counsel asked questions of several of the police officers who had been involved in the investigation of the case, which were designed to show to the jury that appellant went to great lengths to cooperate fully with the investigation of his wife's killing, even during the cold case investigation of the matter.
 {¶ 93} Following this testimony, the trial court informed the parties that it had decided to allow appellee to introduce testimony that appellant had attempted to interfere with the investigation of his wife's rape and murder, by employing deceptive techniques such as deep breathing during the polygraph examination.
 {¶ 94} The trial court found that defense counsel's questions to police officers about whether appellant had cooperated at the scene of the crime were appropriate and that appellee could not elicit testimony from the polygraph examiner because of them. However, the trial court found that defense counsel's questions about whether appellant had done anything to impede the cold case investigation "opened the door" to allowing the prosecution to elicit testimony from the polygraph examiner showing that appellant had, in fact, taken steps to impede the cold case investigation by employing "counter measures" such as deep breathing techniques in an attempt to defeat the polygraph. For the reasons that follow, we conclude that the trial court's decision to allow this testimony did not amount to an abuse of discretion.
 {¶ 95} "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Generally, all relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid.R. 402.
 {¶ 96} However, "[although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Furthermore, "[although relevant, evidence may be *Page 21 
excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).
 {¶ 97} A trial court has broad discretion in the admission and exclusion of evidence and its decision will not be reversed unless the trial court has clearly abused its discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 109; State v. Sage (1987), 31 Ohio St.3d 173, paragraph one of the syllabus. "An abuse of discretion `connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'"Jackson, 107 Ohio St.3d at 89, quoting Adams, 62 Ohio St.2d at 157.
 {¶ 98} The Ohio Supreme Court has held that the results of a polygraph examination are inadmissible since such tests have not attained scientific or judicial acceptance as an accurate and reliable means of ascertaining truth or deception. State v. Souel (1978),53 Ohio St.2d 123. The results of a polygraph test are admissible if both parties agree to have them admitted and if certain conditions are met. Id.
 {¶ 99} In this case, the trial court refused to allow the polygraph examiner to testify as to the results of the polygraph, and limited the polygraph examiner's testimony as to his observations of appellant and his opinion on those observations. The trial court instructed the jury that the polygraph examiner would not testify about the results of the polygraph, but only "whether or not there is some evidentiary value to the testimony of how or the process by which the test was taken. It is to be used for no other purpose." The trial court also instructed the jury not to infer "a conclusion one way or the other" about the results of the polygraph.
 {¶ 100} The polygraph examiner testified that in light of his training and experience, he believed that appellant was using deep breathing techniques as a "counter measure" to defeat the polygraph examination. As appellee contends, this testimony provided evidence of appellant's "consciousness of guilt," and thus of appellant's guilt itself. SeeState v. *Page 22 Williams, 79 Ohio St.3d 1, 11, 1997-Ohio-407 (the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself).
 {¶ 101} Furthermore, while relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury," Evid.R. 403(A), allowing appellee to present such testimony was justified in light of defense counsel's attempt to portray appellant as someone who was willing to answer hours of questions without a lawyer, and someone who encouraged an investigation into the matter. In light of the fact that the admission or exclusion of evidence generally lies within the trial court's discretion, Finnerty, 45 Ohio St.3d at 109;Sage, 31 Ohio St.3d 173, paragraph one of the syllabus, and in light of all the facts and circumstances of this case, we see no abuse of discretion in the trial court's decision to permit the polygraph examiner to testify about appellant's use of counter measures when taking the polygraph test.
 {¶ 102} Appellant's fifth assignment of error is overruled.
 V {¶ 103} Assignment of Error No. 6:
 {¶ 104} "THERE WAS INSUFFICIENT EVIDENCE TO JUSTIFY A CONVICTION OF INVOLUNTARY MANSLAUGHTER AND AGGRAVATED BURGLARY."
 {¶ 105} Appellant argues that because there was no credible evidence, either direct or circumstantial, to connect him to the burglary of his residence or the killing of his wife, it was a violation of his due process rights to convict him of complicity to involuntary manslaughter and complicity to aggravated burglary. We disagree with this argument.
 {¶ 106} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, *Page 23 after viewing the evidence in a light most favorable to theprosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" (Emphasis added.) State v. McKnight, 107 Ohio St.3d 101, 112, 2005-Ohio-6046, quoting State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 107} When the evidence is viewed "in a light most favorable to the prosecution," it is clear that there was ample evidence to find appellant guilty of complicity to involuntary manslaughter and complicity to aggravated burglary. This evidence would include the testimony of Henson, who testified that appellant hired his half-brother, Phelps, to scare his wife by staging a burglary at Vickie's home.
 {¶ 108} Appellant responds to this evidence by arguing that Henson's testimony is the only evidence that links him to the offenses of which he was convicted, and that Henson's testimony is not credible in light of Henson's lengthy criminal record and his history of telling different stories to the police about this incident. Therefore, he asserts, his convictions are not supported by sufficient evidence.
 {¶ 109} However, in evaluating the sufficiency of the evidence, a reviewing court such as this one is obligated to view the evidence in a light most favorable to the prosecution. McKnight,107 Ohio St.3d at 112. Furthermore, a reviewing court is not permitted to substitute its judgment for that of the jury's regarding the credibility of witnesses. See State v. Benge, 75 Ohio St.3d 136, 143, 1996-Ohio-227.
 {¶ 110} Because appellant's argument under this assignment of error is aimed at emphasizing the lack of credibility of one of the state's key witnesses, Henson, appellant's argument is more properly characterized as a challenge to the manifest weight, rather than sufficiency, of the evidence.
 {¶ 111} A challenge to the manifest weight of the evidence differs from a challenge to the sufficiency of the evidence. McKnight,107 Ohio St.3d at 112, citing State v. Scott, *Page 24 101 Ohio St.3d 31, 2004-Ohio-10. In considering a manifest weight of the evidence challenge, an appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences [that can be drawn from it], considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 112} While a reviewing court must consider the credibility of the witnesses in evaluating a manifest weight of the evidence claim, the court must be mindful of the fact that the weight to be given the evidence and the credibility of the witnesses are matters primarily for the jury. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Moreover, the decision of the jury is owed deference since the jury is "`best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" State v.Miles (Mar. 18, 2002), Butler App. No. CA2001-04-079, quotingSeasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 113} In this case, appellant has failed to show that his convictions are against either the sufficiency or manifest weight of the evidence. While it is true that Henson is a career criminal and there is evidence that he has told different stories to different people regarding these events, appellant's assertion that Henson's testimony is the only evidence to link him to the crimes at issue is not true.
 {¶ 114} The 911 tape in which appellant can be heard saying, "I gotta call Phelp, man" strongly links appellant to the crimes charged in this case. Appellant counters this by asserting, as he did at trial, that he was merely saying "I gotta call for help, man." Appellant *Page 25 
further asserts that his words "for help" were mistaken for "Phelp" because he "slurred" the words "for" and "help" together. But the jury was free to disbelieve appellant's explanation. See State v.Nichols (1993), 85 Ohio App.3d 65, 76 (a jury is free to believe all, part or none of a witness' testimony). Furthermore, appellant has never had a plausible explanation as to why he would say, "I gotta call for help, man," at the same time he was on the telephone with a 911 dispatcher who had already told him several times that help was on the way.
 {¶ 115} Additionally, several of the police officers who arrived at the scene on the day Vickie Barton was killed testified that the burglary that was supposed to have taken place at appellant's and Vickie's residence appeared to have been staged. For instance, Detectives Gary Miller and Mark Duvelius both testified that the Barton home appeared too orderly to have been the scene of a burglary. Detective Miller noted that guns had been laid out side by side, as if there had been some care taken not to damage them, and that the drawers had been pulled out but not dumped. Detective Duvelius testified that a telephone cord had been unplugged, rather than pulled, from a wall, and that pictures had been turned face down, indicating that whoever committed the burglary of the residence had some knowledge of its inhabitants.
 {¶ 116} Several of the officers also noted that appellant spoke about the perpetrator or perpetrators in the plural. For example, Lieutenant (then Deputy) George Hunter, who was the first police officer on the scene, testified that the first thing appellant said to him was "they shot her man, they've killed her." Later on, Lieutenant Hunter heard appellant say "why did they have to kill her — those murdering bastards."
 {¶ 117} Furthermore, while Henson's credibility may have been open to question, there was evidence that tended to support the veracity of his testimony. For example, Henson's testimony showed that he was aware of certain details that were not generally known to the public, such as the fact that Vickie Barton had been bitten on one of her breasts at the time *Page 26 
she was killed. Henson also testified that a gas can that was found in appellant's garage was the same as the one that he and Phelps had used in past burglaries as a ruse to determine if anyone was at home in any residence that they intended to burglarize.
 {¶ 118} Appellant counters this evidence by pointing to the testimony of Major Gary Miller, who was one of the police detectives that investigated the case. Major Miller testified that in 1996 he had interviewed a hairdresser, Johnna Bray, who knew certain details about the case that were believed to have been unknown by the public. Appellant also cites the testimony of his mother-in-law (i.e., Vickie Barton's mother) who testified that the gas can belonged to her and her husband.
 {¶ 119} However, the fact that appellant was able to show that one citizen may have known certain details about the case that were not generally known to the public does not conclusively demonstrate that this kind of information was generally known in the community. Moreover, the jury was entitled to disbelieve the testimony of appellant's mother-in-law, as it was clear that she believed in appellant's innocence. See Nichols, 85 Ohio App.3d at 76.
 {¶ 120} In light of all of the evidence presented in this case, we conclude that appellant's convictions are not against either the sufficiency or manifest weight of the evidence.
 {¶ 121} Appellant's sixth assignment of error is overruled.
 VI {¶ 122} Assignment of Error No. 7:
 {¶ 123} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN THE WAY IT INSTRUCTED THE JURY."
 {¶ 124} Appellant raises three arguments under this assignment of error. First, appellant argues that the trial court deprived him of a fair trial because the court's final *Page 27 
instructions to the jury initially omitted the definition of "knowingly" and, therefore, the trial court should have declared a mistrial. We disagree with this argument.
 {¶ 125} Before the trial court issued final instructions to the jury, appellant was given a chance to review them. The trial court had inadvertently omitted the definition of "knowingly" with respect to the felonious assault element of the aggravated burglary charges. However, appellant's trial counsel failed to raise an objection to that omission. The trial court later discovered its mistake and informed the parties about it. Once informed, appellant's trial counsel then raised an objection to the omission. When the trial court asked trial counsel what remedy he proposed, trial counsel, after conferring with his co-counsel, informed the trial court that he would not be requesting a mistrial. The trial court then issued a definition of "knowingly" to the jury.
 {¶ 126} Once the jury retired again to consider its verdict, appellant's trial counsel informed the trial court that he had changed his mind, and requested the trial court to declare a mistrial. The trial court overruled the motion. At this point in the proceedings, the jury had been deliberating for less than three hours.
 {¶ 127} Crim.R. 30(A) states in relevant part:
 {¶ 128} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."
 {¶ 129} "The decision to grant a mistrial under Crim.R. 33 rests within the sound discretion of the trial court. State v.Blankenship (1995), 102 Ohio App.3d 534, 569, citing State v. Sage
(1987), 31 Ohio St.3d 173, 182. An appellate court will not disturb this exercise of discretion `absent a showing that the accused has suffered material prejudice.' Id. The granting of a mistrial is only necessary where a fair trial is no longer possible. Id., *Page 28 
citing State v. Franklin (1991), 62 Ohio St.3d 118, 127. A mistrial should not be granted `merely because some minor error or irregularity has arisen.' Id., citing State v. Reynolds (1988), 49 Ohio App.3d 27, 33." State v. Johnson, Butler App. No. CA2005-10-422, 2006-Ohio-5195, at ¶ 36.
 {¶ 130} Here, appellant failed to raise a timely objection to the omitted instruction as required under Crim.R. 30(A) and, therefore, is deemed to have waived all but plain error. Furthermore, mistrials should not be granted because some minor error or irregularity has arisen in the proceedings. Johnson at ¶ 36.
 {¶ 131} In this case, the jury had been deliberating for less than three hours when the trial court recognized that it had omitted the definition of "knowingly" from its final instructions, and then provided it to them. The jury deliberated for the rest of that day, from approximately 6:00 p.m. to the time they adjourned for the night at approximately 8:20 p.m., and for all of the next day, from 9:00 a.m. to 7:00 p.m., before returning a verdict in the case.
 {¶ 132} Appellant's trial counsel failed to call the error to the trial court's attention at a time when the error could have been corrected or avoided altogether, and the error of which he now complains was minor and promptly corrected. The trial court did not abuse its discretion in overruling appellant's request for a mistrial.
 {¶ 133} In his second argument under this assignment of error, appellant argues that the trial court erred when it "ad-libbed" examples of the definitions of certain terms that it provided to the jury. Appellant also claims that the trial court "presupposed" that the jury would find appellant guilty of burglary. We disagree with this argument.
 {¶ 134} Initially, appellant has only specified one "ad-lib" that he finds objectionable, namely, the trial court's example of what might constitute involuntary manslaughter in relation to a bank robbery. Appellant was represented at trial by two attorneys: one who was appellant's lead counsel, and another who served as co-counsel. Appellant's co-counsel was *Page 29 
present when the trial court reviewed the jury instructions with the parties' counsel. The trial court specifically told the parties that he would be using the bank robbery example, which he had given co-counsel on previous occasions. Co-counsel raised no objection. However, after the trial court issued the instructions with the "ad-libbed" examples, and after the jury had retired to deliberate, appellant's lead counsel raised an objection.
 {¶ 135} As stated, Crim.R. 30 provides that a party may not assign as error the giving or failure to give an instruction unless he objects before the jury retires to consider its verdict. Where a defendant fails to raise a timely objection to the giving or failure to give an instruction, the defendant has waived all but plain error. State v.Adams (1980), 62 Ohio St.2d 151, 154.
 {¶ 136} In this case, appellant has offered no explanation as to how the trial court's instructions to the jury presupposed that the jury would convict him of burglary or how the ad-libbed examples that the trial court provided to the jury "emphasized a finding of guilty, yet omitting [sic] a possible not guilty verdict." Reviewing the trial court's instructions to the jury in their entirety as we are obligated to do, see State v. Fields (1984), 13 Ohio App.3d 433, 436, we see no evidence of any error that would rise to the level of plain error that would require a reversal.
 {¶ 137} The third argument that appellant raises under this assignment of error is that the trial court erred by issuing a Howard[4] charge to the jury "because it had the effect of forcing the jury to reach a conclusion, even though it had clearly been previously unable to." We disagree with this argument.
 {¶ 138} Initially, there is no indication in the record that appellant raised any objection to the trial court's decision to issue aHoward charge to the jury and, therefore, has waived all *Page 30 
but plain error. In this case, however, the trial court did not commit any error in issuing this charge to the jury, plain or otherwise.
 {¶ 139} Appellant is essentially arguing that issuing aHoward charge to a jury is coercive, per se. However, the Ohio Supreme Court has upheld the use of a Howard charge on several occasions, and has specifically found that such an instruction is not coercive. SeeState v. Brown, 100 Ohio St.3d 51, 60, 2003-Ohio-5059. TheHoward charge is intended to be issued to a jury that believes it is deadlocked in order to "challenge them to try one last time to reach a consensus." State v. Robb, 88 Ohio St.3d 59, 81, 2000-Ohio-275.
 {¶ 140} In this case, while the jury may not have actually reported to the trial court that they were deadlocked, appellant himself has acknowledged that the jury "clearly [had] been * * * unable to" reach a consensus in this case. Under these circumstances, there is nothing in the record to show that the trial court abused its discretion or otherwise erred in issuing a Howard charge to the jury in this case.
 {¶ 141} Appellant's seventh assignment of error is overruled.
 VII {¶ 142} Assignment of Error No. 8:
 {¶ 143} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT IMPOSED CONSECUTIVE SENTENCES ON HIM."
 {¶ 144} Appellant argues that the trial court abused its discretion by imposing consecutive sentences on him for involuntary manslaughter and aggravated burglary, given the substantial amount of evidence he presented in mitigation regarding his background, record and career. We disagree with this argument.
 {¶ 145} Initially, as appellant himself implicitly acknowledges, the trial court correctly applied the law that was in effect at the time appellant committed the offenses of which he *Page 31 
was convicted rather than the amended sentencing provisions of Am. Sub. S.B. No. 2 ("S.B. 2"). S.B. 2 applies only to those crimes committed on or after July 1, 1996. State v. Rush, 83 Ohio St.3d 53,1998-Ohio-423, paragraph two of the syllabus.
 {¶ 146} Former R.C. 2929.41(B)(1), which was in effect at the time appellant committed the offenses, provided that a sentence of imprisonment must be served consecutively to any other sentence of imprisonment "when the trial court specifies that it is to be served consecutively." "[T]he decision of whether a criminal defendant is to serve the sentences for all his crimes consecutively or concurrently is a matter of sentencing discretion, the exercise of which is committed to the trial court." State v. Johnson (1988), 40 Ohio St.3d 130, 133-134. As we have already stated, "[a]n abuse of discretion `connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Jackson,107 Ohio St.3d at 89, quoting Adams, 62 Ohio St.2d at 157.
 {¶ 147} In this case, it is apparent that the trial court took into consideration all of the mitigating evidence that appellant cites. The trial court noted that there was no evidence that appellant intended Vickie Barton's death, but that appellant was "clearly and solely responsible for the crime of complicity to aggravated burglary." The trial court based its decision to impose the maximum penalty for the crimes of which appellant was convicted "on the breach of trust by [appellant], both as a husband, pledged to love, honor and protect his wife, and as a police officer, empowered to carry a gun, make arrests, enter private homes, and do all the things that we as a society entrust our police officers to do."
 {¶ 148} In light of all the evidence presented at the sentencing hearing and all of the circumstances of this case, we conclude that the trial court did not abuse its discretion in ordering appellant to serve his sentences consecutively.
 {¶ 149} Appellant's eighth assignment of error is overruled. *Page 32 
 VIII {¶ 150} Assignment of Error No. 9:
 {¶ 151} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT DID NOT CONDUCT ALL SIDEBAR PROCEEDINGS ON OBJECTIONS ON THE RECORD."
 {¶ 152} Appellant argues that the trial court committed reversible error by failing to record all sidebar proceedings in which either he or appellee objected to a statement or question proposed by the opposing party, because it effectively impeded appellate review on those matters. We disagree with this argument.
 {¶ 153} Crim.R. 22 provides that "[i]n serious offense cases all proceedings shall be recorded." "`Serious offense' means any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R. 2. Because this case involves serious offenses as defined in Crim.R. 2, all proceedings should have been recorded pursuant to Crim.R. 22. However, the trial court's failure to record all of the sidebar conferences in this case does not constitute reversible error.
 {¶ 154} Initially, appellant raised no objection at trial to the trial court's failure to record all of the sidebar conferences. Therefore, we must review this argument under the plain error standard of review.State v. Jells (1990), 53 Ohio St.3d 22, 32.
 {¶ 155} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As a general rule, however, plain error is to be recognized only where "the outcome of the trial clearly would have been different absent the error." State v. Hill,92 Ohio St.3d 191, 203, 2001-Ohio-141. "In addition, plain error should be found only in exceptional circumstances and only to prevent a manifest miscarriage of justice." Id.
 {¶ 156} Despite appellant's assertion that he was severely prejudiced by the trial *Page 33 
court's failure to record all sidebar conferences, appellant has presented no evidence to demonstrate that he was prejudiced in any way by this error. Jells, 53 Ohio St.3d at 32. Indeed, on several occasions during the trial, appellant proffered testimony at the conclusion of a sidebar conference, and there is no indication that the trial court ever prevented appellant from making a proffer of any testimony or other evidence at trial.
 {¶ 157} Furthermore, the Ohio Supreme Court has stated that "[w]here a proceeding has not been preserved counsel may invoke the procedure of App.R. 9(C) or 9(E) to reconstruct what was said or to establish its importance. `In the absence of an attempt to reconstruct the substance of the remarks and demonstrate prejudice, the error may be considered waived.'" Jells, 53 Ohio St.3d at 32, quoting State v. Brewer (1990),48 Ohio St.3d 50, 60-61.
 {¶ 158} Here, appellant did not comply with the above procedures for reconstructing the substance of the remarks made during the sidebar conferences. Additionally, appellant has not demonstrated that he was prejudiced by the trial court's failure to record all sidebar conferences during the trial. Indeed, appellant was allowed to proffer anything he wished in order to preserve the matter for purposes of appeal. Therefore, the trial court did not commit reversible error by failing to record all of the sidebar conferences conducted at trial. SeeJells, 53 Ohio St.3d at 32, and Brewer, 48 Ohio St.3d at 60-61.
 {¶ 159} Appellant's ninth assignment of error is overruled.
 IX {¶ 160} Assignment of Error No. 11:
 {¶ 161} "THE STATE OF OHIO VIOLATED THE RULE OF STATE V.JOHNSTON, 39 OHIO ST.3d 48, 529 N.E.2d 898 (1988), WHEN IT DID NOT CALL ATTENTION TO THE COURT AND THE DEFENDANT THAT ITS KEY WITNESS, GARY HENSON, HAD HIS MEMORY HYPNOTICALLY REFRESHED." *Page 34 
 {¶ 162} Appellant argues that his convictions should be reversed because appellee failed to notify him or the trial court that Henson had his memory hypnotically refreshed. We disagree with this argument.
 {¶ 163} Initially, the record shows that appellee informed appellant during discovery that Henson had "submitted to interviews using investigative hypnosis." Appellant did not object to Henson's testimony at trial on these grounds, nor did he cross-examine Henson on the subject. Therefore, appellant has waived any challenge to Henson's testimony regarding this issue, absent plain error. Cook,65 Ohio St.3d at 520. Plain error is to be recognized only when it can be said that the outcome of the trial clearly would have been different absent the error. Hill, 92 Ohio St.3d at 203.
 {¶ 164} The Ohio Supreme Court has divided the testimony of witnesses who have been hypnotized into three categories for purposes of ruling on its admissibility: (1 ) testimony supplied while under hypnosis, (2) testimony regarding matters recalled prior to hypnosis, and (3) testimony that has been refreshed by hypnosis. State v. Johnston (1988),39 Ohio St. 3d 48, 50.
 {¶ 165} As to the first category, testimony supplied by a witness under hypnosis is inadmissible per se. Id. In this case, Henson did not testify while under hypnosis.
 {¶ 166} As to the second category, "testimony supplied by a witness regarding events recalled and related prior to and independent of hypnosis is admissible if the trial court determines that the proposed testimony is substantially in conformance with the pre-hypnosis memory of the witness. Id. at 51, citing State v. Maurer (1984),15 Ohio St.3d 239, 260. The party intending to offer the testimony of a witness regarding events recalled prior to hypnosis should conduct a pre-hypnosis interview of the witness to allow the trial court to determine whether the testimony at trial conforms to the witness' pre-hypnosis memory, and to enable the trial court to determine the effects, if any, of the hypnosis on the witness' memory. *Page 35 
 Johnston, 39 Ohio St.3d at 51, fn. 4.
 {¶ 167} As to the third category, i.e., testimony that has been refreshed by hypnosis, "the trial court must determine whether, in the totality of the circumstances, the proposed testimony is sufficiently reliable to merit admission." * * * Johnston * * *, paragraph three of the syllabus. The trial court "should make this determination in a pretrial hearing, applying the several factors listed in Johnston. Id. at 54-55.Such a hearing is not, however, required when the previously hypnotizedwitness testifies to facts recalled prior to any hypnosis." (Emphasis added.) State v. Cook (1992), 65 Ohio St.3d 516, 520, citingJohnston at 50-51; State v. Spirko (1991), 59 Ohio St.3d 1; andState v. Maurer [(1984), 15 Ohio St.3d 239].
 {¶ 168} Here, the record is unclear as to whether Henson testified to: (1 ) facts recalled after his recollection was refreshed by hypnosis, in which case there "should" have been a pretrial hearing,Johnston, 39 Ohio St.3d at 54, or (2) facts recalled prior to hypnosis, in which case a pretrial hearing would not have been required,Cook, 65 Ohio St.3d at 520. As a result, it cannot be said that the outcome of these proceedings clearly would have been different had the issue been raised in the trial court. Hill, 92 Ohio St.3d at 203.
 {¶ 169} Furthermore, appellant's failure to raise the issue of hypnosis may well have been a strategic decision on his part. As appellee points out, questioning Henson about hypnosis might have added credibility to Henson's testimony. If the jury thought the details of Henson's testimony were recited in a hypnotic state, appellant would be at the risk that the jury might have believed that Henson could not have intentionally fabricated that testimony. This would have conflicted with the attempt by appellant's defense counsel to convince the jury that Henson had fabricated his testimony about appellant's involvement in the crime to get himself out of prison.
 {¶ 170} For all of the foregoing reasons, we conclude that the trial court did not commit plain error with respect to the hypnosis issue. *Page 36 
 {¶ 171} Appellant's 11th assignment of error is overruled.
 X {¶ 172} Assignment of Error No. 3:
 {¶ 173} "APPELLANT RECEIVED THE INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 174} Appellant argues that his trial counsel provided him with constitutionally ineffective assistance of counsel. We disagree with this argument.
 {¶ 175} In order to prevail on an ineffective assistance of counsel claim, a criminal defendant must make the two-pronged showing set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, a defendant must show that his counsel's performance was deficient. Id. at 687. This requires showing that his counsel's performance "fell below an objective standard of reasonableness." Id. at 687-688. Judicial review of counsel's performance must be "highly deferential," and a reviewing court must indulge a strong presumption that counsel's conduct is professionally reasonable and, under the circumstances, might be considered sound trial strategy. Id. at 689.
 {¶ 176} Second, a defendant must show that his defense counsel's deficient performance prejudiced him. Id. at 687. This requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A failure to make a sufficient showing on either the "performance" or "prejudice" prong of the Strickland standard will doom a defendant's ineffective assistance of counsel claim. See id. at 697.
 {¶ 177} Appellant contends that his trial counsel's performance was deficient in three areas. First, appellant argues that his trial counsel erred by not challenging the hypnosis of Henson. We disagree with this argument. *Page 37 
 {¶ 178} As we have indicated in response to appellant's 11th assignment of error, there is no showing that Henson's refreshed testimony was any different than what he had told police before he was hypnotized. Moreover, appellant's defense counsel may have deliberately chosen not raise the issue of hypnosis as a matter of trial strategy. As a result, the record fails to show that a hearing on the hypnosis issue was required under Johnston, as appellant claims See id., 39 Ohio St.3d at 54, and Cook, 65 Ohio St.3d at 520.
 {¶ 179} Second, appellant argues that his counsel's performance was deficient in that it opened the door to evidence of his alleged polygraph deception. We disagree with this argument. Defense counsel's decision to question the officers who investigated this case whether appellant fully cooperated with them was a matter of trial strategy that is entitled to deference. Strickland, 466 U.S. at 689.
 {¶ 180} Third, appellant argues that his counsel's performance was deficient in that his counsel failed to raise an objection at trial to: (1) Henson's alleged hearsay testimony regarding what Phelps told him about appellant's involvement in the burglary that led to the killing of his wife, and (2) the admission of the 911 tape. However, we disagree with these arguments for the same reasons we overruled appellant's second and fourth assignments of error. Simply put, an objection to this evidence would have been unsuccessful and, therefore, appellant's defense counsel was not ineffective for failing to object to these matters.
 {¶ 181} Appellant's third assignment of error is overruled.
 XI {¶ 182} Assignment of Error No. 10:
 {¶ 183} "THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS DEPRIVED DEFENDANT-APPELLANT OF A FAIR TRIAL."
 {¶ 184} Appellant argues that even if any of the individual errors set forth in the *Page 38 
preceding assignments of error is not sufficient to justify a new trial, the cumulative effect of the errors is. We disagree with this argument.
 {¶ 185} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." State v. Garner, 74 Ohio St.3d 49, 64,1995-Ohio-168, citing State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. The doctrine essentially requires an analysis of whether all of the "harmless errors" in the case have a total cumulative effect of denying a defendant his or her constitutional right to a fair trial.
 {¶ 186} In this case, the doctrine of cumulative error has no application because appellant has failed to demonstrate that there were any errors in this case, harmless or otherwise.
 {¶ 187} Appellant's tenth assignment of error is overruled.
 {¶ 188} Judgment affirmed.
POWELL, P.J., and BRESSLER, J., concur.
[1] R.C. 2923.03(F) states that "[a] charge of complicity may be stated in terms of this section [i.e., the complicity statute], or in terms of the principal offense."
[2] Appellant also presented the testimony of another of Henson's cellmates, Michael Moore, who testified that Henson said that he had been threatened by the police with being charged with obstruction of justice if he refused to testify. The trial court concluded that Moore's affidavit and testimony contributed little to appellant's motion. The court expressly found that "Henson was not `threatened' by the police to testify but was merely reminded that he could be prosecuted if he obstructed justice." Appellant has not challenged this finding and, in any event, the trial court was in the best position to assess Moore's credibility. See State v. Miles (Mar. 18, 2002), Butler App. No. CA2001-04-079, quoting Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
[3] Although Crawford declined to provide a comprehensive definition of what constituted "testimonial statements," it did state that such statements included "`ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' * * * `extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' * * * [and] `statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]' * * * "[Citations omitted.]Crawford, 541 U.S. at 51-52. Crawford stated that it was leaving "for another day any effort to spell out a comprehensive definition of `testimonial.'" Id. at 68. Nevertheless, the court stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" since "[t]hese are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id.
[4] State v. Howard (1989), 42 Ohio St.3d 18. *Page 1