[Cite as *State v. Glenn*, 2018-Ohio-2326.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27639 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-821 |
| | : | |
| DALE A. GLENN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of June, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

ADAM J. ARNOLD, Atty. Reg. No. 0088791, 120 West Second Street, Suite 1502, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1}  Dale Anthony Glenn was found guilty by a jury in the Montgomery County Court of Common Pleas of three counts of murder and two counts of felonious assault, each of which included a firearm specification, and one count of having weapons while under disability.  After merger of some of the offenses, Glenn was sentenced to an aggregate term of 21 years to life in prison.  He appeals from his conviction, challenging several of the trial court's pretrial rulings.  For the following reasons, the trial court's judgment will be affirmed.

### *Facts and Procedural History*

{¶ 2}  On March 8 and 9, 2016, Glenn went to several bars with a friend, Kendall Mabry; they arrived at the K-9 Club after 1:30 a.m. on March 9.    Around 2:00 a.m., the victim, "Michael,"[1] who was known to Glenn, also arrived at the  K-9 Club.  Almost immediately, Glenn and Michael got into a physical altercation, and Glenn was thrown out of the bar by K-9 Club security personnel.  Glenn went back to his car, waited several minutes, then pulled up to the front door of the club.   In the meantime, Glenn's friend and others got into a fight with Michael inside the club, which eventually spilled out into the parking lot.   Glenn then shot Michael several times, killing him.

{¶ 3}  On March 18, 2016, Glenn was indicted on three counts of murder (purposeful, proximate result - serious harm, and proximate result - deadly weapon), two counts of felonious assault, and two counts of having weapons while under disability. Each of the counts of murder and felonious assault contained a firearm specification.

---

[1] The record contains serious allegations against the victim, which were never proven. For this reason, we will refer to him only by his first name.

One of the counts of having weapons while under disability was later dismissed at the State's request.

**{¶ 4}** Glenn filed numerous pretrial motions in which he asserted that his act of shooting Michael was directly linked to his (Glenn's) discovery a few months earlier that Michael had raped Glenn's four-year-old daughter and had infected her with a sexually transmitted disease (STD). According to Glenn, his daughter had been diagnosed with gonorrhea in November 2015. The girl's mother suspected Michael "as the perpetrator and transmitter of the STD," because he (Michael) was the only male who had "access" to the daughter in the relevant time frame and because the child had allegedly identified Michael to Glenn as the perpetrator. According to Glenn, Michael had also informed Glenn's daughter's mother, with whom Michael was in a relationship, that he (Michael) had an STD for which he was being treated. The matter was allegedly still under investigation at the time of the shooting.

**{¶ 5}** Glenn filed pretrial motions to suppress identification evidence and to have the coroner test or examine Michael for STDs. The motion for STD testing included the allegations discussed above: that Michael may have transmitted an STD to Glenn's daughter, who had identified Michael as the perpetrator, and that such sexual contact was related to Glenn's motive for the killing. The motion further stated that medical records (which were not attached to the motion and are not in the record) showed that the child "had contracted gonorrhea from an adult male." Finally, the motion stated that whether Michael had "an STD similar to the one" Glenn's daughter had was "relevant and material to the defense." Glenn subsequently filed additional motions for 1) testing of Michael's DNA or bodily fluid, again aimed at determining the presence of any STDs; 2)

production of Michael's medical records; and 3) production of investigative materials from the prosecutor's office and the police department related to any investigation of Glenn's daughter's rape allegations. The State opposed all of these motions.

{¶ 6} Glenn also filed a pretrial motion for expert witness fees for a psychological expert to evaluate Glenn for "personality disorders or violent propensities" which "show the mitigating factors" to support a finding that he committed voluntary manslaughter, rather than murder. The State also opposed this motion, but the motion was granted.

{¶ 7} On December 5, 2016, the trial court filed an order which barred the presentation of certain evidence at trial, including psychological evidence related to Glenn's state of mind at the time of the shooting and evidence of Michael's medical records or criminal history with potential relevance to his motive. Before trial, the trial court also made it clear to the parties that it would not give a jury instruction on voluntary manslaughter.

{¶ 8} The case was tried to a jury on May 22-24, 2017. The jury found Glenn guilty on all counts, including the firearm specifications. The trial court merged the three counts of murder; it also merged the two counts of felonious assault with the murder and merged all of the firearm specifications. Glenn was sentenced to 15 years to life for murder, with a three-year firearm specification, and to 36 months for having weapons while under disability, for an aggregate term of 21 years to life.

{¶ 9} On appeal, Glenn raises one assignment of error:

The trial court abused its discretion in granting pre-trial motions based upon fact which improperly impeded [his] constitutional right to testify on his own behalf and consequently have evidence presented at trial to permit a

voluntary manslaughter jury instruction.

We understand this argument to be that the trial court erred in excluding evidence which might have supported a voluntary manslaughter instruction and in failing to give such a jury instruction.

### Voluntary Manslaughter

{¶ 10} R.C. 2903.03 defines the crime of voluntary manslaughter as follows:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * * .

{¶ 11} Voluntary manslaughter is an inferior offense of murder, because "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements." *State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶ 21, citing *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 722 (1992); *State v. Terrion*, 9th Dist. Summit No. 25368, 2011-Ohio-3800, ¶ 11, quoting *State v. Deem*, 40 Ohio St.3d 205, 209, 533 N.E.2d 294 (1988). "The mitigating element * * * is that the defendant acted 'while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force.' " *Beatty-Jones* at ¶ 21, quoting R.C. 2903.03(A) (voluntary manslaughter).

{¶ 12} The test for voluntary manslaughter includes both an objective and a subjective component.

First -- the objective factor -- a fact-finder must determine whether a serious

provocation occurred and whether that provocation was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). Second -- the subjective factor -- the fact-finder must evaluate whether "this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634, 590 N.E.2d 272.

*State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 153.

{¶ 13} If insufficient evidence of the elements of the inferior degree offense is presented, such that no reasonable jury could decide that the defendant was guilty of that offense, the trial judge must, as a matter of law, refuse to give the instruction on the inferior degree offense. *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶ 44, citing *Shane; State v. Spencer*, 12th Dist. Clermont No. CA2017-04-020, 2018-Ohio-641, ¶ 15; *State v. Mowls*, 5th Dist. Stark No. 2017CA00019, 2017-Ohio-8712, ¶ 27-28. Where there is insufficient evidence to satisfy the objective portion of the analysis, no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted. *Florence* at ¶ 44.

{¶ 14} While the State bears the burden of proof on the charged offenses, a defendant being tried for murder must prove the additional mitigating elements of voluntary manslaughter by a preponderance of the evidence. *State v. Rhodes*, 63 Ohio St.3d 613, 620, 590 N.E.2d 261 (1992); *Thompson* at ¶ 153.

### *Limitations on Defense Evidence and Jury Instructions*

{¶ 15} Glenn argues that the trial court erred in preventing him from presenting evidence that "would reasonably lead a juror to acquit [him] of the indicted charge of

murder."

{¶ 16}  Glenn's pretrial motions sought to obtain (and, presumably, present at trial) various evidence in support of his professed belief, prior to the shooting, that Michael had raped his daughter.   However, Glenn's pretrial motions acknowledged that the alleged rape had been discovered by Glenn several months before the shooting.   The pretrial motions also alleged that Michael had threatened Glenn's daughter's mother in the time since the rape was discovered and reported, including by "litter[ing] [her car] with bullets." (The motions did not provide any verification of these claims, such as police reports.) Glenn's motions asserted that, because of Michael's actions, Glenn had been in a sudden passion or fit of rage at the time of the shooting.   Glenn's motions did not specifically assert that Michael had provoked him or indicate what – or who – had started the fight on the night of the shooting.

{¶ 17}  In ruling on the pretrial motions, the trial court considered video recordings from the K-9 Club's security cameras, the accuracy of which was not in dispute.   These recordings allowed the court to create a timeline of the relevant events.

{¶ 18}  In its December 5, 2016 order, the trial court concluded that Glenn was not entitled to present evidence about the alleged rape in an effort to establish the elements of voluntary manslaughter:

> Ohio's voluntary manslaughter statute states: "No person, while under the influence of **sudden** passion or in a **sudden** fit of rage, either of which is brought on by serious provocation **occasioned by the victim** that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

Under Ohio law and elsewhere, it is crystal clear that "any passion or rage felt by an offender who has had **time to cool off** does not qualify for 'sudden passion' or 'sudden fit of rage' under the current voluntary manslaughter statute. The case-law dealing with the **'cooling off' period** indicates that it is **a very short time** span." Ohio courts have even found that the brief time it takes to reload a gun is a sufficient cooling off period.

The Court has reviewed at considerable length video surveillance of the K-9 Club on the night Defendant killed [Michael]. The footage shows that **over eight and one-half minutes lapsed** from the time Defendant was first expelled from the establishment until he shot [Michael] multiple times, killing him. Case law from Ohio's sister [courts] supports this Court's conclusion that the time lapse here constitutes a cooling off period that, as a matter of law, prevents this Court from instructing the jury on a Lesser Degree Offense by reason of sudden passion or sudden fit of rage. And given Defendant's admitted knowledge since November, 2015, **approximately four months before the killing**, of the allegations surrounding [Michael] and his sexual contact with Defendant's young daughter, Defendant's assertion that he acted under **sudden** passion or **sudden** fit of rage stretches verisimilitude past the breaking point.

Finally, the Court also notes that it was **Defendant who provoked the altercation** inside the Club with [Michael] and not the other way round. This admission contravenes the voluntary manslaughter statute itself, wherein the victim must occasion the serious provocation. And thus the

Court would be proscribed from instructing the jury as Defendant wishes on this basis as well.

In short, all evidence relating to Defendant's daughter, and allegations that she contracted an STD from sexual activity with [Michael] is **irrelevant** and therefore **inadmissible** under Ohio R. Evid. 401, 402, 403(A) and 403(B), particularly since motive is not an element of murder as charged against Defendant. * * *

(Citations omitted; emphasis sic.)

{¶ 19} In the same order, the court also specifically found that the testimony of Glenn's psychological expert, Dr. Barbara Bergman, which would have been offered "to demonstrate that Defendant was acting under a sudden passion or fit or rage at the time of the alleged crime" was "barred as a matter of law."

{¶ 20} Although we generally review trial court decisions related to the admissibility of evidence and proper jury instructions for an abuse of discretion, *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116, *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240, the court's pretrial determination of this issue held, "as a matter of law," that Glenn was not entitled to argue that his acts constituted voluntary manslaughter. We review questions of law de novo. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 16.

{¶ 21} The trial court's statements that, under Ohio law, the provocation must have been occasioned by the victim, with no cooling off period, are well-supported. For example, in *State v. Edwards*, 1st Dist. Hamilton No. C-050883, 2006-Ohio-5596, the defendant testified that she had been "emotionally traumatized" since being raped by the

victim several weeks earlier.   *Id.* at ¶ 27.   Edwards had testified, inconsistently, that 1) she did not remember events for a time on the night of the shooting, and did not shoot her alleged rapist, and 2) when she heard the alleged rapist laugh, it reminded her of the same laugh she had heard the night she was raped, and she shot him in his car outside a convenience store.   *Id.* at ¶ 18.   Because the alleged rape had occurred approximately six to seven weeks before the shooting, the court held that Edwards had had sufficient time to "cool off" between the rape and the alleged rapist's murder, and that the jury could not have reasonably found the elements of voluntary manslaughter.   *Id.* at ¶ 27, ¶ 32. *See also State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 97 (in the context of the mitigation phase of a death penalty case, "an alleged, yet unproven, rape of the offender by a victim that occurred some four years earlier [did not] constitute strong provocation at the time of the murders" for purposes of mitigation)

{¶ 22}   In *State v. Snyder*, 5th Dist. Tuscarawas No. 10AP060021, 2011-Ohio-3334, a wife had allegedly "taunted" her husband during an argument about her sleeping with other men; the defendant-husband shot her twice, then retrieved a knife from his garage and cut her throat.   The court determined that it was not objectively reasonable to conclude that the wife's taunting behavior and other "running of her f[*****] mouth" were sufficient to arouse the passions of an ordinary person beyond the power of his or her control.   *Id.* at ¶ 47-49.   This was especially true because the defendant had known of his wife's affairs for some time, and took time to retrieve a different weapon before he ultimately killed her.

{¶ 23}   *Snyder* is akin to Glenn's case in two respects: it contained a lengthy cooling off period between the time Snyder learned of his wife's infidelity and the time of

her killing, and it also contained a shorter cooling off period between the start of the attack on the victim (with a gun) and the defendant's retrieval of the knife with which he ultimately killed her.

{¶ 24} In *State v. Simpson*, 2d Dist. Montgomery No. 24266, 2011-Ohio-6181, the defendant also had known for some time that his girlfriend was seeing another man; he claimed to have "snapped" and killed his girlfriend while talking with her about the affair and about her desire to leave him. Under those circumstances, we concluded that there was not "sufficient provocation to induce sudden passion or a fit of rage reasonably resulting in Simpson's use of deadly force." *Id.* at ¶ 14. The Supreme Court has held that "[t]he killing of a spouse * * * by a spouse * * * who has just been made aware of the victim spouse's adultery simply is not an acceptable response to the confession of infidelity" and does not form a sufficient basis for a voluntary manslaughter instruction. *Shane,* 63 Ohio St.3d at 637, 590 N.E.2d 722.

{¶ 25} *See State v. Gillespie*, 3rd Dist. Paulding No. 11-16-07, 2017-Ohio-6936, ¶ 43 (holding that two-week lapse between victim's alleged holding a gun to defendant's head and defendant's shooting of victim did not constitute "very short time span" that precluded "cooling off" and therefore did not permit conclusion that defendant acted in "sudden fit of rage"); *State v. Horn*, 5th Dist. Richland No. 2010 CA 0078, 2011-Ohio-2168, ¶ 26 (assertion that victim had pointed a gun at defendant 4 months before fatal altercation found to be "irrelevant to a charge of voluntary manslaughter"; "we cannot find that an event which happened four months earlier constituted serious provocation.") *But see State v. Patterson*, 10th Dist. Franklin No. 14AP-290, 2014-Ohio-2740, ¶ 13 (where altercation between stepfather of 7-year-old boy and man who had allegedly

propositioned boy to perform oral sex occurred less than 20 minutes after the encounter and even shorter time after stepfather learned of the encounter, there was sufficient evidence that stepfather's assault on victim was objectively reasonable and incited by sudden passion or rage to warrant aggravated assault instruction).

{¶ 26} Here, the trial court also found that Glenn's "cooling off period" of several minutes between the time he was told to leave the bar and the time of the shooting precluded the presentation of evidence about or jury instructions related to voluntary manslaughter. Again, the trial court's decision and analysis accurately reflect the position taken by many Ohio courts that even a very short period of reflection or disconnection from the heat of the moment constitutes a sufficient "cooling off period." *See, e.g., Snyder* (voluntary manslaughter instruction not warranted where defendant retrieved a second weapon in the midst of an altercation, with which the victim was then killed); *State v. Stanley*, 7th Dist. Mahoning No. 14 MA 0106, 2016-Ohio-7284, ¶ 24 (the time it took for defendant to leave in his car, apparently obtain his gun, and then return to the business 3-5 minutes later was a sufficient cooling off period); *State v. Caulton*, 7th Dist. Mahoning No. 09 MA 140, 2011-Ohio-6636, ¶ 72 (shooting the victim several times, walking away, and then returning to "finish him off" by shooting him several more times shows cool deliberation rather than sudden passion); *State v. Byerly,* 5th Dist. Richland No. 02-C81, 2003-Ohio-6911 (the time it takes for a person to walk one-half mile home is enough for a cooling off period); *State v. Shakoor,* 7th Dist. Mahoning No. 01CA121, 2003-Ohio-5140, ¶ 105, citing *State v. Crago*, 93 Ohio App.3d 621, 644, 639 N.E.2d 801 (10th Dist.1994) (shooting victim in the head, then standing over him and shooting him multiple additional times, tends to show cool deliberation and not sudden passion).

{¶ 27} In this case, it is undisputed that, several months before the shooting, Glenn was aware of the alleged rape of his daughter. We are not aware of any Ohio case in which a defendant was found to have acted under sudden passion or fit of rage for purposes of establishing voluntary manslaughter or another inferior degree offense where the alleged provocation occurred several months earlier, and Glenn has cited none. Moreover, Glenn waited in the parking lot for more than eight minutes after his altercation with Michael before shooting him. Under these circumstances, the trial court reasonably found, as a matter of law, that it was not objectively reasonable to conclude that Glenn's knowledge of the rape had caused him to act in a "sudden passion" or "fit of rage" on the night of the shooting. Thus, even if Glenn subjectively believed that his daughter had been raped by Michael, we conclude that the trial court did not err in finding that Glenn's shooting of Michael four months later, after Glenn had a "cooling off" period of several minutes in his car, was insufficient to show that he was under the influence of sudden passion or acted in a sudden fit of rage.

{¶ 28} Moreover, demonstration of serious provocation of Glenn by Michael was another element of voluntary manslaughter on which Glenn had the burden of proof. Glenn did not contend in his pretrial motions that Michael had done something on the night of the shooting – other than being present at the same location as Glenn – to seriously provoke Glenn. In fact, his pretrial motions did not address the issue of provocation at all.

{¶ 29} We recognize that this case was in a somewhat unusual procedural posture, because the trial court decided many questions about the admissibility of evidence, the jury instructions it would give, and the types of objections it would sustain

– at least with respect to voluntary manslaughter – prior to trial, when some of the details of the relevant events, such as the circumstances around the altercation at the bar, had not been fully developed.[2]   As such, they were interlocutory orders and were subject to reconsideration by the court.   However, a careful examination of the testimony at trial does not provide a basis to conclude that the trial court's pretrial ruling was improper or would have been reconsidered, if Glenn had asked the court to do so.[3]

{¶ 30}   Glenn provided somewhat contradictory testimony at trial about the cause of his altercation with Michael, his state of mind at the time, and even his recollection of the events at all.   On direct examination, he testified that he believed Michael had molested his young daughter and that he and Michael got into a fight when Michael arrived at the K-9 Club, which was the first time Glenn had seen Michael since his daughter's allegations were made.   Glenn testified that Michael "approached, swung on me and we got into an altercation," which a bouncer broke up by sending Glenn outside to the parking lot.   Glenn further testified that he was thinking about his daughter as he sat in the car and that he "blanked out" when Michael and Mabry came out of the bar,

---

[2] For example, the trial court's December 5, 2016, decision on the pretrial motions stated that "it was Defendant who provoked the altercation."   Based on the record before us, it does not appear that this fact was conclusively established by the video or any other evidence in the pretrial phase, and it would have been an issue for the jury. However, because the trial court reasonably concluded, as a matter of law, that Glenn had not acted in a sudden passion or fit of rage, its statement with respect to provocation was not prejudicial to Glenn.

[3] As discussed in greater detail below, defense counsel sought a ruling on the record at trial that he was not being allowed to pursue testimony about the basis for Glenn's beliefs about the rape, but he did not expressly ask the court to reconsider its ruling. The defense also did not proffer any of the medical evidence it sought in pretrial motions or a statement about its inability to obtain such evidence in the absence of a court order.

fighting.   Glenn stated that he did not remember much of what was depicted in the bar's video, but he remembered being angry at Michael.   Glenn also did not remember what he did with his gun after the shooting.

{¶ 31}   On cross-examination, Glenn testified that he could not remember whether he had sought out Michael inside the K-9 Club or what brought about the fight.   Once Glenn was outside in the car, he stated that he called his mother, but he could not remember whether he told his mother that he had been in a fight with Michael.   Glenn did not dispute that the video depicted that he sat in the car for 8 to 9 minutes between the time he exited the bar and the time Mabry and Michael came outside.   When asked whether he had his gun in his hand before Mabry and Michael exited the bar, Glenn could not remember, but he testified that he did have the gun in his hand when he exited the car immediately prior to the shooting.   Glenn also testified that he had no idea how many shots he fired at Michael.

{¶ 32}   A bouncer from the K-9 Club testified that he threw Glenn out the back door of the bar (near the parking lot) after Glenn's altercation with Michael; the bar's policy prohibited putting both men outside at the same time.   The bouncer described the altercation between Glenn and Michael as "just a little scuffle," and he stated that the fight was not difficult to break up.   After the second altercation (between Mabry and Michael), many people were exiting the bar to the parking lot, and the bouncer followed them outside.   He ducked when the shooting started; the bouncer did not see the shooting, but he saw Michael on the ground, not moving, when the shooting stopped, and he (the bouncer) quickly went back inside.

{¶ 33}   Mabry testified that Michael was the instigator of the second altercation (by

punching Mabry), but Mabry did not see and was not even aware of the first altercation involving Glenn. He testified that he had not seen Glenn with a gun that day prior to the shooting, and that everyone who entered the K-9 Club was searched for weapons and required to leave them outside or at the door.

{¶ 34} The daughter of the owner of the K-9 Club was at the bar visiting her father on the night of the shooting. She knew Michael and Mabry, but not Glenn. She testified that the bar was crowded and that she was aware of a fight breaking out, but she did not know who had been involved. She testified that she learned that Michael had been involved in the altercation, and she observed that he had "a cut above his right eye" afterward. She then left the bar with a friend and was inside her vehicle in the parking lot when the second fight, involving Mabry and Michael, drew her attention as it "pushed out the front door." She testified that Michael got jumped by more than one person and came running toward her car. As she looked out the windshield, she heard gunshots and Michael fell. He tried to get up to run, but fell again. The owner's daughter identified Glenn as the man who had done the shooting. Glenn then got in a car with Mabry and left. She checked on Michael but knew he was dead, and she called 911.

{¶ 35} Very little of this evidence about the events at the K-9 Club suggested that Glenn was in a sudden passion or fit of rage, that he was upset about his daughter's alleged rape, or that Michael had provoked the confrontation with Glenn at the bar. Although Glenn stated that he was thinking about his daughter when he sat in the car, when he testified about calling his mother from the car, he could not remember whether he had mentioned his altercation with Michael. None of the witnesses, including Glenn, testified that he had been in an emotional state during this time.

{¶ 36}  We also note that Glenn was allowed to testify about his belief that Michael had raped his daughter, notwithstanding the trial court's pretrial ruling that he could not present extrinsic evidence aimed at proving the alleged rape.   When Glenn testified, he was asked whether he "was angry at [Michael] for some reason" at the time of their altercation in the bar, and he responded that he "believe[d] [Michael] molested my four-year-old daughter while he [Michael] stayed with the kids – the mother of my kids." Defense counsel did not immediately ask any follow-up questions.

{¶ 37}  A short time later, defense counsel asked Glenn, "why did you have those suspicions[?]"   The State objected, and there was a discussion at side bar:

THE COURT:        I presume you're anticipating that he's about to offer hearsay testimony and therefore, if he gets into, you know, my daughter told this, objection, hearsay, sustained, stricken.   [Her mother] told me this, objection, sustained, stricken.   Okay.   And I'm going to give the instruction that I featured earlier this morning which is now that is stricken because it's highly improper because [Michael] has been silenced and can no longer speak for himself, therefore, we're never going to get to the truth of those allegations.

So are you sure you want to go down this road, [Defense counsel]?

DEFENSE COUNSEL:     I wanted for you to make a ruling.   I (indiscernible) to do that, Judge.   Now I don't necessarily – once his objection is sustained, I don't have any reason to go forward, but I wanted – I needed to go there.   I'm not trying to get him to do that stuff, I just wanted it to soak in that I tried.

THE COURT:     I am unaware of any basis for his beliefs other than what he was told by somebody.   Now I presume, [Defense Counsel], that he would have never presumed, has never told you, has never claimed, and you have no reason to expect that he's going to testify that he walked in and observed any conduct in person involving his daughter and [Michael].   And therefore, the only basis for his belief would be hearsay from other people. Am I correct?

DEFENSE COUNSEL:     That's correct (indescernible).

THE COURT:          All right.   Then at this point based on the representation of counsel, I will sustain the objection and the question is stricken and they're to disregard. * * *

{¶ 38}  There was no proffer of what Glenn's answer would have been, nor was there a proffer of the content of any medical or police reports or similar evidence which – if they existed and if he were aware of them – would conceivably have supported an argument that Glenn's anger and actions were based on something other than his testified-to "belief" that the rape had occurred.

{¶ 39}  With respect to provocation or acting under "sudden passion or in a sudden fit of rage," Glenn's trial testimony alluded to Michael's taking the first "swing" in their physical altercation, but he also testified that he did not remember who or what started the fight.   ("I don't really remember no conversation we had, but he approached, swung on me and we got into an altercation.")   Further, the video evidence of the events at the bar, a portion of which were played for the jury at trial, established that Glenn spent several minutes in his car in the parking lot between the time of the physical altercation

with Michael inside the bar and the shooting outside the bar. Thus, the evidence at trial supported the trial court's pretrial ruling that this "cooling off period" precluded Glenn from arguing that he had acted in a sudden passion or fit of rage.

{¶ 40} Glenn also argues that the trial court erred in not allowing him to present an expert psychological evaluation "concerning [his] personality and/or subjective state of mind." The court had approved funding for the expert but, at the time that this evidence was discussed in the pretrial proceedings, the doctor's report had not yet been prepared. Nonetheless, the trial court concluded that, given the passage of four months between the time of the rape allegations and the altercation between Glenn and Michael, and the more than eight minutes that elapsed between the time of the altercation inside the bar and the shooting outside the bar, there was no question that Glenn had not acted under the influence of sudden passion or in a sudden fit of rage.

{¶ 41} The trial court concluded that, as a matter of law, because of the "cooling off" period, neither the objective nor subjective test for voluntary manslaughter had been satisfied and that, as such, the expert's opinion about Glenn's subjective state of mind was irrelevant. Even if such a report were admissible concerning Glenn's subjective state of mind, an issue we are not addressing, the record does not contain any report or clearly indicate that one was prepared. Although the court stated that, when the expert's report was prepared, Glenn would be able to make it part of the record for appellate review, the record was never supplemented to include the report, if, in fact, such a report was produced. Because the psychologist's report is not in the appellate record, and Glenn's brief does not specifically describe how this report would have been helpful to him, we cannot find that Glenn was prejudiced by its exclusion.

{¶ 42}  As we indicated in paragraph seven above, the trial court stated before trial began that it would not give a jury instruction on voluntary manslaughter.  After the parties rested, the court held an in-chambers conference related to the jury instructions on the record and presented the attorneys with proposed final instructions.  The proposed instructions did not contain any reference to voluntary manslaughter.  Glenn did not object at that time or after the instructions were read to the jury.  A defendant's failure to object to the instructions waives error on appeal absent plain error.  *State v. Kleekamp*, 2d Dist. Montgomery No. 23533, 2010-Ohio-1906, ¶ 59.

{¶ 43}  Regardless, the trial court found that Glenn's proposed characterization of his conduct as voluntary manslaughter was not supported in light of the cooling off periods between the rape allegation and the encounter at the bar and between the altercation inside the bar and the shooting outside the bar.  On the record before us, we cannot find that the trial court erred as a matter of law or abused its discretion in reaching this conclusion.  The trial court did not err or abuse its discretion in excluding evidence offered to show that defendant committed voluntary manslaughter, rather than murder.  The trial court also did not err or abuse its discretion in not giving jury instructions on voluntary manslaughter.

{¶ 44}  The assignment of error is overruled.

{¶ 45}  The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck
Andrew T. French
Adam J. Arnold
Hon. Steven K. Dankof