[Cite as *State v. Dobson*, 2025-Ohio-2148.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                              :

    Plaintiff-Appellee,            :

                                       No. 114303

    v.                                      :

BILL W. DOBSON, JR.,                       :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 18, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-684898-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben O. McNair, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant Bill Dobson, Jr., appeals from his judgment of conviction that was rendered, in part, after a jury trial and, in part, after a bench trial. After a thorough review of the facts and pertinent law, we affirm.

**Procedural History**

{¶ 2} Dobson, along with a codefendant, Wylee Orr, Jr., was charged with various crimes for the fatal August 2021 shooting of Jamal Fitch. Count 1 charged aggravated murder; Counts 2 and 3 charged murder; Counts 4 and 5 charged felonious assault; and Count 6 charged involuntary manslaughter. Count 7 was relative to only Dobson and charged him with having weapons while under disability; Count 8 charged only Orr with having weapons while under disability. All the counts against Dobson included one- and three-year firearm specifications. With the exception of Count 7, the counts also included notices of prior conviction and/or repeat-violent-offender specifications.

{¶ 3} Dobson waived a jury trial on the notices of prior convictions and repeat-violent-offender specifications, Count 6 (involuntary manslaughter), and Count 7 (having weapons while under disability). The remaining counts and specifications were tried to a jury.[1] At the close of the State's case, the defense made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. The defense rested without presenting any witnesses and renewed its Crim.R. 29 motion, which was again denied.

{¶ 4} The State's theory of the case was that Dobson aided and abetted Orr in killing Fitch. The State presented the following testimony in support of its theory.

---

[1] The trial was not a joint trial with codefendant Orr. The record demonstrates that Orr's whereabouts were unknown during much of the pendency of Dobson's case and at the time of Dobson's trial Orr was incarcerated in Iowa on an unrelated case.

**Facts as Elicited at Trial**

{¶ 5} In addition to Orr, another individual, Katherine Caraballo, was implicated in this matter. Caraballo testified at trial. She described codefendant Orr as her best friend. Caraballo testified that on the day in question, she attended a wake for a mutual friend of hers and Orr's. After the wake, she went to see Orr at his mother's house. Orr and another individual he was with wanted to go to a party center where a repast for their deceased friend was being held. Caraballo drove them in her black Jeep Patriot but did not go into the party center because she was grieving and wanted to be alone; she sat in her car for a period of time smoking marijuana. She eventually drove home because she was hungry and wanted to get something to eat.

{¶ 6} Once at home, Caraballo received a call from Orr asking her to come get him from the repast. She told him that she had just arrived home, was hungry, and he would have to wait for a while. Orr was impatient, however, and kept calling and rushing Caraballo. Caraballo testified that she got a call from a number she did not recognize. She answered the call and it was Dobson, whom she had met on a couple of prior occasions. Dobson asked Caraballo to pick him up before she went to get Orr; Caraballo complied with his request.

{¶ 7} After getting Dobson, Caraballo started driving in the direction to the repast to get Orr but Dobson told her that Orr was not there; rather, Orr was "down the way" at "Longwood." While Caraballo was driving to Longwood, Dobson was on the phone with Orr, telling him that they were on the way. Caraballo drove to

Longwood, and Orr got into her vehicle. She started driving, but Orr asked her to stop because he had forgotten something. Orr requested Dobson get out of the vehicle with him; according to Caraballo, Dobson was initially hesitant, but eventually did get out of the car with Orr. Caraballo testified that she thought Orr truly had forgotten something and requested Dobson to go with him because it was late and they were in a "dangerous area."

{¶ 8} Caraballo testified that she remained in her car, listening to music and looking at her phone, when she heard gunshots. She looked and saw Orr and Dobson running toward her car. She believed someone was shooting at them, so she put her car in drive, and as soon as Dobson and Orr got in she sped off. Dobson was yelling, "[G]o, go, go. Get me the f--- out of here." Dobson, who was in the front passenger seat, had a gun that he was "waving" around. Orr was in the back of the car, and Caraballo testified that she did not look back to see if he had a gun, but he asked Dobson if he knew how to take his gun apart, and she could hear him doing something that sounded like taking a gun apart.

{¶ 9} Orr directed Caraballo to drive back to the house where she had picked Dobson up from, which she did. Dobson and Orr got out of Caraballo's car; Orr instructed Caraballo not to leave. Dobson and Orr went into Dobson's house, and Orr came back out with a change of clothes. According to Caraballo, on the car ride to Dobson's house, Dobson was "dapping [Orr] up"; "dapping" is a friendly exchange or greeting. Dobson also said he "ran his Ps." Caraballo explained that running

someone's Ps means going through their pockets. She understood the conversation to mean that Dobson went through someone other than Orr's pockets.

{¶ 10} Caraballo was arrested in the early morning hours of the following day, and it was at that time she learned that Fitch had been shot to death at Longwood, which was located in the Arbor Park complex. Caraballo admitted that she lied to the police in her initial interview with them. She explained that Orr had threatened her that evening; she started to testify as to what he said, the defense objected, and the court sustained the objection. *See* tr. 462. The State then asked Caraballo over the defense's objection, which was overruled: "[p]rior to the police interviewing you, was there something that [Orr] said to you that had an effect on your willingness to talk to the police?" Caraballo responded, "Yes sir." *Id.* at 463. The State further probed: "[s]o I want to know what it was that [Orr] said to you but I only want to know the thing he said that affected your willingness to be truthful with [the police]?" *Id.* at 463-464. The defense objected, and the court held a side bar.

{¶ 11} At side bar, the State maintained that it was offering the testimony solely for the effect it had on Caraballo and her initial hesitancy to be truthful to the police. After discussion of the issue (*see id.* at 464-471) and the defense acknowledging that, "[b]ottom line is, yes, I have an ability to effectively cross-examine" Caraballo on her testimony about what Orr said to her, the trial court overruled the defense's objection. *Id.* at 468. Caraballo then testified that Orr knew where she and her family lived, which was "right around the corner" from Dobson,

and she was concerned about her own and her family's safety and so she was less than truthful with the police initially. Caraballo never testified to what threatening statement Orr made to her.

{¶ 12} Caraballo was charged with aggravated murder and associated crimes and spent approximately seven weeks in jail before posting bond. She decided to meet with the police again and this time, she testified, she told them the truth. The aggravated murder indictment was dismissed and Caraballo was charged with and pleaded guilty to obstructing justice and improperly handling firearms in a motor vehicle. At the time of her trial testimony, Caraballo had not been sentenced and she admitted that she hoped for the imposition of community-control sanctions.

{¶ 13} Cleveland police Detective Andrew Hayduk was the lead detective on the case. Detective Hayduk went to the crime scene shortly after the shooting and obtained surveillance video from the area. He had previously obtained video from the Arbor Park complex where the shooting occurred and was familiar with the recording system. The detective testified that the recording system was properly functioning at the relevant time and properly time-stamped, with one exception. The one exception was on one video that had an incorrect date and time-stamp in the upper left-hand corner but had the correct date and time-stamp in the lower right-hand corner. The was no audio on the videos. The videos show Dobson and Orr approach victim Fitch — a female had been standing with Fitch but she ran once the shooting started; the police never learned her identity.

{¶ 14} The police also obtained video footage from the party center where the repast was held. The video shows Fitch, Orr, and others on scene. Some in the group appeared to get animated, and Fitch, who had a gun, shot up in the air, prompting most of the crowd to run. The video showed that Fitch and Orr had a conversation; there was no audio.

{¶ 15} Dobson was arrested approximately one week after Fitch's murder. The police learned at that time that he was subject to GPS monitoring via an ankle monitor and retrieved the data associated with the monitor. The data from the ankle monitor placed Dobson at the scene of the murder and at the time of the murder. Dobson denied being at the scene and told the police that he was in another nearby area — Outhwaite or Case Court.

{¶ 16} The police told Dobson that they had DNA evidence connecting him to the crime. Dobson still denied having anything to do with the shooting. In fact, no DNA evidence connected Dobson to the crime and the gun used to kill Fitch was never recovered. Detective Hayduk testified that "bluffing" is an acceptable police tactic.

{¶ 17} Detective Hayduk also testified to State's exhibit No. 40, which was a four-and-a-half-minute video put together "overlaying or stitching together the various videos collected from the Arbor Park area with the GPS data." Tr. 547. The video purported to show that Dobson was at the scene of the murder at the time of the murder. Detective Hayduk did not create the video.

{¶ 18} A representative from the agency that affixed Dobson's ankle monitor also testified. She confirmed that Dobson was wearing the same monitor on the day of the crime as he was wearing approximately one week later when he was arrested. The representative explained the possible error rate — of up to 33 feet — in the data collected from Dobson's monitor. The representative was familiar with areas of Longwood, Outhwaite, and Case Court, and testified that with a possible error rate of up to 33 feet, if an individual was at Longwood, the data would not register the person as being at Outhwaite or Case Court. The agent acknowledged the potential limitations of GPS monitoring that could occur because of the quality of the receiver, atmospheric conditions, and satellite geometry.

{¶ 19} The autopsy of Fitch revealed that he sustained 14 gunshot wounds and that the shots were fired in close range.

{¶ 20} As to a possible motive for the shooting, Detective Hayduk testified that he learned that Orr's brother had been murdered in 2020 and Fitch's cousin was charged and convicted of the murder.

**Verdict and Sentence**

{¶ 21} After its deliberations, the jury returned guilty verdicts on all the counts and specifications it considered (i.e., aggravated murder, murder, and felonious assault with the attendant one- and three-year firearm specifications). The trial court likewise returned guilty verdicts on the counts and specifications it considered (i.e., involuntary manslaughter, having weapons while under disability

both with attendant one- and three-year firearm specifications, and the notices of prior conviction and repeat-violent-offender specifications).

{¶ 22} The trial court merged the murder, felonious assault, and involuntary manslaughter convictions into Count 1, aggravated murder. The court sentenced Dobson to six years' imprisonment on the firearm specifications, which consisted of three years on the specifications for each Counts 1 and 2, to be served consecutively. On the aggravated murder count, the court sentenced Dobson to life again with the possibility of parole in 25 years, to be served consecutively with the gun specifications. Thus, Dobson was sentenced to a total prison term of 31 years to life.

**Assignments of Error**

I. The trial court erred in admitting the Exhibit 40 which combined the video footage and GPS data without proper authentication and over appellant's object and violated his confrontation rights.

II. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the State failed to present sufficient evidence to establish the elements necessary to support the convictions beyond a reasonable doubt.

III. Appellant's convictions are against the manifest weight of the evidence.

IV. The trial court erred by admitting hearsay consisting of the non-testifying co-defendant's alleged statement which deprived appellant of due process and a fair trial.

V. The trial court erred by providing the State's unanimity instruction over defense objection.

VI. The imposition of a separate consecutive sentence for a firearm specification that was attendant to a conviction that was merged violates double jeopardy and results in cumulative punishments.

**Law and Analysis**

**The Trial Court Did Not Abuse Its Discretion or Commit Plain Error in Admitting Exhibit No. 40**

{¶ 23} In his first assignment of error, Dobson contends that the trial court abused its discretion in admitting State's exhibit No. 40, which was the four-and-a-half-minute video of stitched together video clips from the crime scene and GPS data from Dobson's ankle monitor.

{¶ 24} Initially, we note that when the State introduced the exhibit during Detective Hayduk's testimony, the defense neither objected nor moved to strike. Moreover, the defense stipulated to the individual components of the video, that is, the maps, Arbor Park videos, and the GPS data. Indeed, the defense noted on the record that it was not objecting to the individual components of the video. *See* tr. 598.

{¶ 25} The defense did make mention, however, to the trial court that it did not have the opportunity to cross-examine the person who created the video. The court found the defense's contention "a bit disingenuous" given that it had stipulated to the individual components of the video. *Id.* at 596. The court further noted that the decision to not call any witness regarding Dobson's ankle monitor was done to protect Dobson — that was, to not inform the jury about his postrelease control or why he was required to wear the monitor. The court noted that creation of exhibit No. 40 was "an inference that [the jury] can make obviously based on the

information they've received." *Id.* at 598. Indeed, the defense acknowledged that "there's no mystery" as to who compiled the video. *Id.* at 594-599.

{¶ 26} Regardless of whether we deem the defense's commentary regarding the exhibit as an objection — subject to the abuse-of-discretion standard of review— or its silence when the State introduced the video as a failure to object — subject to plain error review — we find no merit to Dobson's assignment of error.

{¶ 27} An abuse of discretion occurs when a court exercises its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. Plain errors are obvious defects in trial proceedings that affect "substantial rights," and "although they were not brought to the attention of the court," they may be raised on appeal. Crim.R. 52(B); *State v. Brown*, 2013-Ohio-3134, ¶ 61 (8th Dist.). To affect substantial rights, "the trial court's error must have affected the outcome of the trial." *Brown* at *id.*, citing *State v. Barnes*, 2002-Ohio-68. Plain error is recognized "only in exceptional circumstances . . . to avoid a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 94-95 (1978).

{¶ 28} Dobson raises two main issues regarding the exhibit: (1) inability to cross-examine its maker regarding inaccuracies and errors contained therein; and (2) lack of authentication.

{¶ 29} During his testimony, Detective Hayduk acknowledged the inaccurate timestamp and the potential range of ambiguity regarding the time offset calculation — the defense cross-examined him about all of this. Further, the agent who testified

about Dobson's ankle monitor acknowledged the GPS error rate and the potential limitations of GPS monitoring. These issues may have impacted the weight the jury would assign to the video, but they did not prohibit its admissibility. There was no abuse of discretion or plain error on these grounds regarding the trial court's decision to admit exhibit No. 40.

{¶ 30} Evid.R. 901 governs authentication and identification and provides that "[t]he requirement of authentication and identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The "threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Freeze*, 2012-Ohio-5840, ¶ 65 (12th Dist.), citing *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist. 1991). The State only needs to demonstrate a "reasonable likelihood" that the evidence is authentic. *State v. Roseberry*, 2011-Ohio-5921, ¶ 65 (8th Dist.). We review the issue of authentication for an abuse of discretion. *State v. Taylor*, 2012-Ohio-5421, ¶ 27 (8th Dist.), citing *State v. Barton*, 2007-Ohio-1099, ¶ 80 (12th Dist.).

{¶ 31} Video and photographic evidence may be authenticated under one of two theories: the "pictorial testimony" theory or, relevant to this case, the "silent witness" theory. *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aero. & Agricultural Implement Workers, Local 486*, 61 Ohio St.3d 121, 129 (1991). Under the silent witness theory, the evidence is a "'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring

witness," and the evidence may be admitted "upon a sufficient showing of the reliability of the process or system that produced the evidence." *Id.*

{¶ 32} As mentioned, the defense did not challenge the constituent parts of the video and, indeed, stipulated to their admissibility. Our review of the record demonstrates that the constituent parts of the video were produced by a reliable process or system. And, as mentioned, to the extent that there were inaccuracies and errors in exhibit No. 40, the defense questioned Detective Hayduk about them and the Detective acknowledged them. The exhibit was authenticated under the silent witness theory.

{¶ 33} And that the exhibit may have been damning evidence against Dobson is not ground for reversal. Presumably, "all evidence presented by a prosecutor is prejudicial" to a defendant. *State v. Wright*, 48 Ohio St.3d 5, 7 (1990). However, "not all evidence unfairly prejudices a defendant." *State v. Skatzes*, 2004-Ohio-6391, ¶ 107. Evid.R. 403(A) prohibits the admission of evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The trial court has broad discretion in balancing the probative value against the danger of unfair prejudice. *State v. Harcourt*, 46 Ohio App.3d 52, 55 (12th Dist. 1988). On the record here, there was no abuse of discretion or plain error in admitting exhibit No. 40.

{¶ 34} The first assignment of error is overruled.

**Sufficient Evidence Supported the Convictions**

{¶ 35} For his second assigned error, Dobson contends that the State failed to present sufficient evidence to support his convictions for aggravated murder, the firearm specifications attendant to Counts 1 and 2, and having weapons while under disability and the attendant firearm specifications.

{¶ 36} When determining whether a verdict is supported by sufficient evidence, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Wilks*, 2018-Ohio-1562, ¶ 156, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When evaluating the sufficiency of the evidence, a reviewing court considers "whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at *id.*

{¶ 37} Dobson contends that the State failed to present sufficient evidence that he aided and abetted Orr in killing Fitch and that he had a weapon. We disagree.

{¶ 38} R.C. 2923.03(A) governs complicity and provides in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal

in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-246 (2001). "'[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.'" *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *Johnson* at 245.

{¶ 39} Dobson was charged with and convicted of aggravated murder under R.C. 2903.01, which, relevant to this case, prohibits a person from "purposely, and with prior calculation and design, caus[ing] the death of another." R.C. 2903.01(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "In determining whether a defendant acted purposely, '[a] defendant's state of mind may be inferred from the totality of the surrounding circumstances.'" *State v. Patel*, 2008-Ohio-4693, ¶ 34 (9th Dist.), quoting *State v. Sullivan*, 2008-Ohio-2390, ¶ 10 (9th Dist.).

{¶ 40} "'Prior calculation and design' denotes 'sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation' coupled with circumstances that demonstrate 'a scheme designed to implement the

calculated decision to kill[.]'" *State v. Guerra*, 2013-Ohio-5367, ¶ 6 (9th Dist.), quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. A prolonged period of deliberation is unnecessary, and "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264 (2001). There is no bright-line test for determining whether a defendant acted with prior calculation and design, so courts consider the totality of the circumstances in each case. *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997).

{¶ 41} In this case, the State presented evidence, if believed, to support that Dobson acted with purpose, prior calculation and design, and in complicity with Orr. Caraballo described how, on the day of the shooting, after she left Orr at the party center, Orr called her several times, requesting that she come get him; she described him as rushing her. The record demonstrates that while Orr was at the party center, Fitch (the victim) was also there, he and Orr had a conversation, and Fitch fired a gun into the air.

{¶ 42} In addition to Orr calling Caraballo, Dobson also called her and asked her to come get him before she got Orr. Caraballo agreed and drove to get Dobson. Once Dobson was in Caraballo's car, Caraballo began driving in the direction of the party center. Dobson told Caraballo that Orr was not at the party center anymore and directed her to the location where Orr was. Dobson and Orr had obviously been in contact with each other prior to Caraballo getting Dobson. While Caraballo drove

to the location, Dobson was on the phone with Orr, telling him that they were on the way. Caraballo and Dobson arrived where Orr was, and Orr got in the vehicle.

{¶ 43} With Dobson and Orr in the vehicle, Caraballo began driving until Orr asked her to stop, which she did. Orr got out of the car and asked Dobson to get out too. Although Dobson was initially hesitant, he eventually got out of the car and went off with Orr. Shortly after the two got out of her car, Caraballo heard gunshots and saw Dobson and Orr running toward her car. Once in the car, Dobson yelled at Caraballo to "go, go, go. Get me the f--- out of here." The video and GPS data evidence corroborated Caraballo's testimony relative to Dobson and Orr being at the crime scene at the time of the shooting.

{¶ 44} Further, Dobson's conduct once in Caraballo's car provided evidence that Dobson had acted with purpose in complicity with Orr. Dobson, who was in the front-passenger seat, had a gun that he "waved" around and Dobson and Orr engaged in friendly "dapping" gestures. Dobson said that he "ran his Ps," which Caraballo testified meant he went through someone's pockets, and it was her understanding that Dobson was referring to someone other than Orr.

{¶ 45} Considering reasonable inferences and the totality of the circumstances, the State presented sufficient evidence to support the aggravated murder and firearm specifications attendant to Counts 1 (aggravated murder) and 2 (murder). Dobson's challenge to the having weapons while under disability count revolved on whether he had a firearm; the evidence demonstrating he did was sufficient.

{¶ 46} The second assignment of error is overruled.

**The Weight of the Evidence Supported the Convictions**

{¶ 47} In his third assignment of error, Dobson contends that his convictions were against the manifest weight of the evidence.

{¶ 48} When evaluating a claim that a jury verdict is against the weight of the evidence, appellate courts "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *Wilks*, 2018-Ohio-1562, at ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Jordan*, 2023-Ohio-3800, ¶ 17.

{¶ 49} A manifest-weight challenge focuses on the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial to prove the elements of the crimes beyond a reasonable doubt. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins* at *id.* "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at *id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). However, inconsistencies in a witness's testimony do not automatically entitle a defendant to a reversal of trial. *State v. Solomon*, 2021-Ohio-940, ¶ 62 (8th Dist.), citing *State v. Nitsche*, 2016-Ohio-3170, ¶ 45 (8th Dist.). Reversing a conviction based upon the weight of the evidence should

occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 50} In this assignment of error Dobson mainly focuses on Caraballo's credibility and self-interest. Upon review, Caraballo's testimony was not so incredible, especially when considered together with the physical evidence, i.e., the videos and GPS data. The physical evidence placed Dobson at the murder scene at the time of the murder. This is not the exceptional case in which the evidence weighs heavily against the convictions.

{¶ 51} The third assignment of error is overruled.

**The Trial Court Did Not Abuse Its Discretion by Allowing Testimony Relative to the Effect the Codefendant's Statements Had on the Listener**

{¶ 52} For his fourth assigned error, Dobson contends that the trial court abused its discretion by allowing Caraballo to testify to hearsay, namely, that she initially lied to the police because she was scared because codefendant Orr had threatened her. The State maintained that the testimony was not hearsay — that is, it was not being offered for the truth of the matter asserted — but, rather, it was being offered to demonstrate the effect it had on Caraballo.

{¶ 53} Under Evid.R. 801(C), hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The Supreme Court of Ohio has explained that "[a] statement is not hearsay when offered for a purpose other than to prove the

truth of the matter asserted." *State v. Osie*, 2014-Ohio-2966, ¶ 118, citing *State v. Davis*, 62 Ohio St.3d 326, 343 (1991). "'It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed.'" *Osie* at ¶ 122, quoting *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980). "A statement is not hearsay when introduced to show its effect on the listener." *Osie* at *id.*

{¶ 54} Hearsay exceptions are reviewed for an abuse of discretion. *State v. Dever*, 64 Ohio St.3d 401, 410 (1992). "[A] trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Thus, a "trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception." *Dever* at *id.*

{¶ 55} The trial court did not abuse its discretion in allowing Caraballo's testimony about why she initially lied to the police. The testimony was not offered to prove what codefendant Orr said to her; rather, it was offered to explain the effect it had on her. We further note that Caraballo never stated what the threat was that Orr made to her — rather, she generically testified that she was scared of him. There was no abuse of discretion.

{¶ 56} The fourth assignment of error is overruled.

## The Trial Court Did Not Abuse Its Discretion by Providing the State's Unanimity Instruction

{¶ 57} At trial, over the defense's objection, the State sought and the court granted an unanimity instruction. In his fifth assignment of error, Dobson contends that the instruction contravened the "established legal requirement for juror unanimity in criminal cases and served to mislead and confuse the jury." Appellant's brief, p. 29.

{¶ 58} Trial court decisions related to jury instructions are generally reviewed for an abuse of discretion. *See, e.g.*, *State v. Glenn*, 2018-Ohio-2326, ¶ 20 (2d Dist.). However, "[w]hether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo." *State v. Echevarria*, 2018-Ohio-1193, ¶ 27 (8th Dist.), citing *State v. Dean*, 2015-Ohio-4347, ¶ 135; *State v. Brown*, 2016-Ohio-1358, ¶ 71 (11th Dist.).

{¶ 59} Under either standard of review, a jury instruction to which an objection has been made "'must be viewed in the context of the overall charge. . .' rather than in isolation." *State v. Burchfield*, 66 Ohio St.3d 261, 262 (1993), quoting *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus. Overall, "[t]he relevant principle for jury instructions is not one of abstract correctness, but is whether an instruction — even if a correct statement of the law — is potentially misleading." *State v. Banks*, 2015-Ohio-5413, ¶ 47 (8th Dist.), citing *State v. White*, 2015-Ohio-492, ¶ 52.

{¶ 60} The trial court here instructed the jury that, "although you must be unanimous on each element of the crime, you need not agree on a single means by which the element is satisfied. That is to say, you do not need to agree on a single way that an offense was committed." Tr. 665.

{¶ 61} This court has held that "[a] jury need not agree on a single means of committing an offense." *State v. Allah*, 2009-Ohio-3887, ¶ 27-28 (8th Dist.). *See also State v. Robinson*, 2014-Ohio-2973, ¶ 44-45 (8th Dist.) (defendant may be convicted under either a principal offender theory or an aider-and-abettor theory and the jury need not "unanimously agree on one of these alternative theories so long as they unanimously agree beyond a reasonable doubt that the defendant's actions constituted the offense charged").

{¶ 62} The Ohio Supreme Court has also weighed in on the issue, holding that

> [a]lthough Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied. *Richardson v. United States* (1999), 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985. Applying the federal counterpart of Crim.R. 31(A), *Richardson* stated that a "jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."

*State v. Gardner*, 2008-Ohio-2787, ¶ 38, quoting *Richardson*.

{¶ 63} The trial court's instruction here comported with the law. Further, the assistant prosecuting attorney's statement in closing argument that each juror could

rely on different evidence to find proof beyond a reasonable doubt (*see* tr. 626) comported with the law.

{¶ 64} The fifth assignment of error is overruled.

**The Trial Court Properly Imposed Consecutive Terms on the Firearm Specifications**

{¶ 65} For his final assignment of error, Dobson contends that the trial court erred in imposing a sentence on the firearm specification attendant to Count 2 after merging Count 2 with Count 1. However, Dobson recognizes that the issue was settled by the Ohio Supreme Court in *State v. Bollar*, 2022-Ohio-4370, but is raising the issue to preserve it for possible further review.

{¶ 66} In *Bollar*, the Ohio Supreme Court held that the plain language of R.C. 2929.14(B)(1)(g) requires that certain offenders receive prison terms for multiple specifications. The court found that the statute

> requires that the offender receive prison terms for each of the two most serious firearm specifications when the offender pleads guilty to [or is convicted of] multiple felony offenses (and at least one of those is a felony listed in the statute) and also pleads guilty to [or is convicted of] multiple accompanying specifications. The statute makes no exception to the application of its provision if one of the underlying felony offenses has been merged. Instead, it simply applies whenever the offender has pleaded guilty to (or been found guilty of) multiple felony offenses and multiple specifications.

*Bollar* at ¶ 19.

{¶ 67} The *Bollar* Court deferred to the legislature's exercise of discretion in enacting R.C. 2929.14(B)(1)(g), noting that in requiring certain offenders to be subject to separate prison terms for multiple firearms specifications, "the General

Assembly appears to have acknowledged that the use of firearms in certain violent crimes should carry a hefty penalty." *Id*. at ¶ 20.  We follow this binding precedent.

**{¶ 68}** The sixth assignment of error is overruled.

**{¶ 69}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

LISA B. FORBES, P.J., and
EILEEN T. GALLAGHER, J., CONCUR